**DEWEY BEACH LIONS CLUB, INC., a non-profit charitable corporation, Plaintiff,**

v.

**Craig A. and Caroline L. LONGANECKER, Stanley C. Underwood and Stacey J. Longanecker, as Trustees of The Longanecker–Underwood Living Trust dated March 5, 2001; Walter and Katherine Lekites; Charles and Lee Gallagher; Pearl Golden; and Mary Ann Dill, Defendants.**

C.A. No. 162–S.

Court of Chancery of Delaware, Sussex County.

Submitted: July 18, 2006.
Decided: Aug. 21, 2006.

Daniel F. Wolcott, Jr., Esquire, Suzanne M. Hill, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for the Plaintiff.

John A. Sergovic, Jr., Esquire, Sergovic & Ellis, P.A., Georgetown, Delaware, Attorney for the Defendants.

## OPINION

LAMB, Vice Chancellor.

In this case, several vacation home owners raise exceptions to a Master's Report which denies their claim to a prescriptive easement over land that the home owners have long used for the purpose of reaching parking in the back of their beach properties. The potentially servient landowner has also challenged the Master's Report in several respects, but does not challenge the result of the Master's adjudication. The court reviews the Master's factual and legal findings de novo, and finds that the Master correctly held in favor of the land-

owner and directs that judgment be entered accordingly.[1]

### I.

The facts of this case were ably laid out by the Master in his Draft and Final Reports. Nonetheless, for ease of reference, the court here briefly recapitulates the facts, supplemented as necessary by the court's review of the evidence.

This matter involves a petition to quiet title to real property in Dewey Beach owned by the Dewey Beach Lions Club. Opposing the petition are the owners of four lots adjoining the Lions Club property (the "Owners"). These property Owners maintain that they have acquired a prescriptive easement across the lands of the Lions Club.

The Lions Club parcel, which consists of approximately 2.85 acres, fronts on Rehoboth Bay on its western boundary, on McKinley Street to the south, and abuts the Owners' lots on the east.[2] The Owners' lots are improved by cottages used by them as summer retreats or rented to vacationers. The southernmost of the four lots, owned by Pearl Golden, borders on McKinley Street. The remaining three lots to the north do not border on a dedicated town street. In creating these four lots, the owner of the larger parcel from which they were created established by deed a 15–foot wide easement running from McKinley Street on the south to the northern most (Longanecker) lot. This 15–foot wide easement allows ingress and

---

1. The Master also found that the landowners had failed to prove an easement by necessity. Although neither party has raised exceptions as to that finding, the court affirms the Master's conclusion on the grounds articulated in his Final Report. *Dewey Beach Lions Club v. Longanecker*, 2006 WL 701980 (Del.Ch. Feb.26, 2006) (hereinafter referred to as "Final Rep.").

2. The four lots, ordered south to north, are owned by Pearl Golden, Charles and Lee Gallagher, Walter and Katherine Lekites, and members of the Longanecker family, respectively.

egress to the otherwise landlocked lots. It occupies the western-most part of each of the parcels, abutting the property line common to the Owners and the Lions Club. However, as is clear from the evidence, this easement is often blocked by cars double-parked along the backs of the more southerly houses. Caroline Longanecker testified, for example, that from 1995 to 2003 people parked in front of Golden's cottage and thus blocked the 15-foot wide easement.[3] The deed restrictions also establish a 25-foot setback from this property line, meaning that, in addition to the 15-foot width of the easement, an additional 10 feet of open space should (by deed) exist between each cottage and the western boundary of each lot.

The Lions Club originally acquired a portion of its property in or about 1959, through the bequest of John T. Waples, and later acquired the remainder of the property through various quit claim deeds. In his will, Waples provided that a portion of the land given to the Lions Club should be maintained as a playground. Accordingly, the Lions Club maintains the Waples playground, open for the use of the public, toward the southeastern portion of its parcel. The playground is surrounded by a fence. A portion of the Lions Club property to the north of the playground, until recently, was occupied by tennis courts. It is now vacant. Located between the property line separating the Lions Club lands from those of the Owners on the east, and the fence running along the playground and (formerly) the tennis courts on the west, is an open area 20 or 25 feet wide.

Fifteen feet of this area, called the "Strip" in this opinion, is occupied by a strip of gravel and sand. At all times pertinent to this case, the Strip has been used by the public as a right-of-way for access to the playground. People coming to use the playground drive along the Strip, abutting the Owners' lots, and park along the playground fence just to the west.

Between 1980 and 2000, the property owned by the Lions Club on McKinley Street (including the area at issue here) was leased to Lisa's Sailboats, Inc. Pursuant to the 1980 lease, the Lions Club leased its Dewey Beach property to Lisa's for a term of five years. The lease provided for Lisa's to move the then-existing Lions clubhouse to another location on the property, and to make improvements thereto. Lisa's, in fact, moved the clubhouse to the beach area of the property, added to it, and operated it as a restaurant. Lisa's was also permitted to operate a sailboat rental business and to charge for the use of the tennis courts on the property. The lease provided that Lisa's was to maintain the existing Waples playground as a public playground. The parties agreed that Lisa's did not have the right to sublet the property. By the terms of the 1980 lease, Lisa's also received an option to renew for three successive five-year terms, which it exercised. The effective term of the lease, therefore, was from 1980 through 2000.

In 1991, the lease was modified to exclude the area of the playground from the leased premises. As the Master observed, it is not clear from the face of the lease or the 1991 amendment whether the Strip was included in the area formally excluded from the leased property in the 1991 amendment.[4] It is clear, however, that for at least the period of 1980 to 1991, the entire Lions Club property, including the playground and the Strip, was in the legal

3. Tr. 194.

4. Pl.'s Opening Br. Ex. KK.

possession of Lisa's, and that during that period the Lions Club held a reversionary interest which would become possessory only upon termination of the lease.

The Owners claim to have used the Strip for at least 20 years. Some record evidence of this use exists as early as 1981, when a lawyer for the Lions Club, Douglas D. Marshall, wrote to Owner Frank Watt proposing a sublease between Lisa's and Watt. In that letter, Marshall proposed that a sublease could be negotiated if Watt was willing to sign a document which stipulated the following:

> To the Dewey Beach Lions Club I acknowledge and agree that the strip of land between my western most property line and the fence currently enclosing the eastern most portion of the Dewey Beach Lions Club Tennis courts, approximately 15 feet between property line and fence is the undisputed property, owned and solely controlled by Dewey Beach Lions Club. I appreciate having used the property in the recent past but claim no right to continued use in the future. I acknowledge and agree that I have absolutely no right to use the land for any purpose without the permission of Dewey Beach Lions Club.[5]

The record does not contain or reflect any follow-up to this letter.

Multiple parties testified at trial that the Strip was used by the Owners at various times throughout the allegedly prescriptive period. Wayne G. Steele, a member of the Lions Club, and a member of the board since 1990, testified that the Club had "traditionally ... let the property owners use that strip for ingress and egress"[6] in addition to allowing the public to use the Strip in order to access the playground. As Steele further explained, the Club "never really prohibited anyone who had a valid usage [of the Strip], we never prevented ingress and egress."[7] This was because it would be difficult to differentiate between people using the Strip to access the playground, and people using it for other purposes.[8] Harry Wilson, who was president of the Lions Club in the mid–1980s, testified similarly that the Club had always allowed people to use the Strip. As he explained, the Lions Club was willing to acquiesce in part because it was interested in "being a good neighbor."[9] Dale Brown, an employee at one of the Lisa's restaurants, testified that from the time the restaurant opened in 1980 or 1981, people parked "wherever [they] could park,"[10] presumably also blocking the easement.

It is nonetheless true, as the Master observed, that the evidence of use in the "early and mid 1980s is more sparse" than the evidence of use in the 1990s.[11] Particularly, the court notes that photographic evidence from that time period suggests that the easement was more heavily traveled at that time than the Strip, raising at least some reason to believe that the Owners were not yet using the Strip for access to their homes.

At some point in the 1990s, the Lions Club attempted to exercise control over parking along the playground fence by towing cars parked there for reasons other than to use the playground. Lisa's immediately objected to this asserted control

5. Pl.'s Opening Br. DX–MM.

6. Tr. 69:9–10.

7. *Id.* at 69:11–16.

8. *Id.* at 69–70.

9. Wilson Dep., DX–O at 31.

10. Tr. 236:18–20.

11. Final Rep. at *5.

because some of the towed cars belonged to its employees or guests.[12] As a result, the Club's attempt to limit parking ended.

After the Lisa's lease expired in 2000, the Lions Club removed the tennis courts and explored the possibility of building a new clubhouse for its members in the now-vacant area. It sought a permit for this improvement from the Town of Dewey Beach, proposing use of the Strip and playground parking area as a driveway and parking area for the clubhouse. At a public hearing on the proposal, some of the Owners appeared and challenged the right of the Lions Club to exclude them from the Strip. This lawsuit resulted. The Lions Club, which holds title of record, seeks a declaratory judgment that it has exclusive dominion over this Strip, and the Owners seek an easement by prescription or of necessity.

## II.

### A. *The Master's Draft Report*

Trial was held before Master Sam Glasscock III on April 4–5, 2005. On September 1, 2005, the Master issued his draft report, resolving the case in favor of the Lions Club. In that opinion, the Master first rejected the Owners' claim that an easement over the Strip had arisen of necessity. Putting aside the threshold question of whether the Lions Club land and the Owners' land had ever been held by a common grantor, the Master held that no easement by necessity could arise because the Owners' grantor had explicitly created an easement for ingress and egress. Thus, held the Master:

Despite the fact the Owners complain that the easement created is insufficiently commodious for their present purposes, it is clear that the common grantor evidenced her intent in the original deeds that the landlocked parcels would be served by the easement. There is simply no justification for presuming that an implicit easement across the Lions Club property arose at the time the Owners' lots were created.[13]

The Master then turned to the Owners' claim of an easement by prescription. After setting out the test for that claim, and assuming that the Owners had demonstrated the open and notorious use of the easement for the 20–year statutory period, the Master found that the Owners had failed to prove their claims for two reasons. First, relying on the case *Old Time Petroleum Co. v. Tsaganos,*[14] the Master found that the prescriptive period could not have run until at least 1991, because before that time, as a result of the original Lions Club lease with Lisa's, the Lions Club lacked the full opportunity to assert its rights against possible prescriptive users of its land. Rather, the Master found:

[I]t was the possessory interest of Lisa's that was injured and would by necessity have to have been raised and vindicated in order to legally prevent the trespass of the Owners over the Strip. The right to eject the Owners and end the trespass was a right belonging to Lisa's, and the opportunity to assert the right was in Lisa's, not the Lions Club.[15]

Whether that status changed in 1991, with the Lions Club's new and somewhat different lease with Lisa's, this meant that the

---

12. Tr. 68.

13. *Dewey Beach Lions Club v. Longanecker,* No. 162–S, Draft Rep. 6 (Del.Ch. Sept. 1, 2005) (hereinafter referred to as "Draft Rep.").

14. 1978 WL 4973 (Del.Ch. Nov.8, 1978).

15. Draft Rep. 10–11.

prescriptive period of 20 years could not have run by 2002.

The Master also relied on the fact that the Owners' use was permissive throughout the entire 20–year period. As the Master observed, the Lions Club "openly made the Strip available to the public to use as a right of way to reach the parking areas along the playground fence. Because that use was permissive, the public at most obtained a license to drive across the strip."[16] Thus, the Master held, the "Owners cannot demonstrate by clear and convincing evidence that their use of the Strip was exclusive or hostile to the rights of the Lions Club...."[17] For those reasons, the Master held in favor of the Club.

### B. *The Master's Final Report*

After both parties had a full opportunity to present their exceptions to the Master's Draft Report, the Master issued his Final Report on February 24, 2006. In that opinion, the Master reaffirmed much of what had been included in the Draft Report. However, as a result of briefing by the parties, the Master withdrew his reliance on the *Old Time* case, noting that the court in that case had relied both on the fact that the landlord lacked rights to press his claims against the prescriptive user, as well as on the fact that the landlord lacked any knowledge of the prescriptive use. Observing that the Lions Club clearly knew of the prescriptive use here, the Master concluded that *Old Time* was distinguishable.[18]

The Master also rejected the Owners' argument that, contrary to the Draft Report, the Owners' use of the Strip was hostile to the Lions Club and exclusive of

the general public because the Lions Club had attempted to stop illicit parking for purposes other than use of the playground. As the Master observed, the fact that the Lions Club attempted to limit parking for unauthorized uses did not affect at all the fact that the Club allowed the entire general public to use the Strip to drive over. "There is nothing in the record indicating that the Lions Club (or Lisa's) ever made an attempt to exclude anyone from driving over the Strip."[19] Thus, the Final Report held in favor of the Lions Club that "no prescriptive rights in the Owners' favor were established."[20]

### III.

### A. *The Owners' Exceptions*

The Owners raise several exceptions to the Master's findings. First, the Owners argue that the Master's Final Report errs in finding that the Owners' use of the Strip was permissive. In their view, because the Lions Club property was leased to Lisa's for the entire relevant period, the Lions Club lacked authority to give permission for any use unauthorized by Lisa's. Thus, the Owners argue, "under the basic principles of landlord/tenant law, the Lions Club during the 20 year lease it granted to Lisa's had no legal power to grant permission to anyone to use the strip, as such use would have been inconsistent with the exclusive possession granted to Lisa's pursuant to the terms of the lease."[21] The Owners additionally argue that even if the Lions Club could have granted permission to the Owners, the Owners "exceeded the terms of that license" when they turned

**16.** Draft Rep. 14.

**17.** *Id.*

**18.** Final Rep. at *4.

**19.** *Id.* at *6.

**20.** *Id.*

**21.** Def.'s Opening Br. 5.

right onto their properties, rather than left into a parking space along the playground fence.[22] On that basis, the Owners claim that the Master erred in finding that they had failed to establish the exclusive and hostile elements of the test for prescriptive easements. Along the same lines, the Owners agree with the Master's withdrawal of his reliance on the *Old Time* case, and argue that the prescriptive period began running in the Owners' favor as of 1980.

### B. *Lions Club's Exceptions*

The Lions Club raises two chief exceptions to the Master's report. First, the Lions Club argues that the Master erred in modifying his holding in the Draft Report that the prescriptive period could not have run against the Lions Club because the Strip was leased to Lisa's. The Club argues that the *Old Time* case is still applicable, and that this fact alone justifies a result in its favor.

Second, the Lions Club argues that the Master erred in failing to consider whether the evidence submitted by the Owners was sufficient to prove each element of prescriptive easement by clear and convincing evidence. Specifically, the Lions Club claims the Master failed to fully consider whether the Owners or their predecessors

in title had used the Strip for 20 years, and also failed to consider "fully" (although the Master held in the Lions Club's favor on this point) whether the Owners' use was hostile or exclusive. Thus, the Lions Club argues, "the Master's Final Report does not sufficiently outline the failure of proof in [the Owners'] case."[23]

### IV.

■ The standard of review for a Master's findings, both factual and legal, is de novo.[24] In this case, where the court is presented with a full record, and in which neither party has argued that the Master has made an erroneous or unsubstantiated credibility determination, the court may conduct its de novo review based on the record alone.[25]

### V.

■ Prescriptive easements are generally disfavored in Delaware.[26] Therefore, a claimant seeking to establish a prescriptive easement must prove by clear and convincing evidence[27] that "she, or a person in privity with her, used the disputed property: (i) openly, (ii) notoriously (iii) exclusively and (iv) adversely to the rights of others for an uninterrupted period of twenty (20) years."[28]

**22.** *Id.* at 6.

**23.** Pl.'s Opening Br. 20.

**24.** *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del.1999).

**25.** *Id.*

**26.** *Anolick v. Holy Trinity Greek Orthodox Church*, 787 A.2d 732, 740 (Del.Ch.2001) (*citing Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *7 (Del.Ch. June 9, 1993)) ("claims of prescriptive rights are disfavored because they necessarily work forfeitures of existing property rights").

**27.** Remarkably, Delaware requires only a preponderance of the evidence to prove adverse possession. *See Ayers v. Pave It, LLC*, 2006 WL 2052377, at *2 (Del.Ch. July 11, 2006) (noting that the difference in the standard of proof between adverse possession and prescriptive easement may seem "incongruous," but is nonetheless the law).

**28.** *Forwood v. Delmarva Power & Light Co.*, 1998 WL 136572, at *7 (Del.Ch. Mar.16, 1998); *see also Lowry v. Wright*, 2006 WL 1586371, at *2 (Del.Ch. June 5, 2006); *Amer v. NVF Co.*, 1994 WL 279981, at *6 (Del.Ch. June 15, 1994).

■ The use of a prescriptive easement must be so open, visible, and apparent that it gives the owner of the servient tenement knowledge and full opportunity to assert his or her rights.[29] As the Master observed in his Final Report, the evidence of such use in the early 1980s is far murkier than the evidence covering the years after 1991. Reviewing the record, however, it seems clear to the court that although the more traveled area in the early 1980s was down the easement, the Owners were using the Strip as early as 1980 or 1981, as the Owners claim. The Owners have proven by clear and convincing evidence that their use was open and notorious for the statutory period.

■ The result in this case, thus, turns on whether the Owners' use can be said to have been exclusive and adverse.[30] As this court has explained, the latter prong of the test includes a duty to prove by clear and convincing evidence that the use was not permissive.[31] That burden, which Delaware law applies to all prescriptive easements, is especially appropriate where a litigant claims a prescriptive right over a neighbor's roadway or path. Part of the logic behind this enhanced scrutiny is simply that land left open to be used by the public for the convenience of the landowner should not be indefinitely burdened by a prescriptive easement, which our law disfavors, simply because the landowner has not taken the active step of granting users of the land express permission. As one court has expressed this logic, "where a space is designedly left open by the owner, either for his own convenience or to enable his customers to resort to him, the presumption ordinarily is that a use of such space by an individual, even for his own purposes, is permissive."[32] Such is also

**29.** 25 Am.Jur.2d *Easements and Licenses,* § 53 (2004).

**30.** Because the court concludes that the Owners have not proven either adverse or exclusive use, the court does not reach the question, much discussed by the parties, of whether a prescriptive period may run against a landlord who is not in possession. *See generally, Old Time,* 1978 WL 4973.

**31.** *Hardesty v. Baynum Enters. Inc.,* 1993 WL 133067 (Del.Ch. Apr.19, 1993); *but see Marta v. Trincia,* 22 A.2d 519, 521 (Del.Ch.1941) (holding that a use was adverse where all the record evidence showed that "any wanderings of strangers in [the disputed tract] were merely occasional, and were wholly separate from, and unrelated to the continuous use which the [adverse users] made in going to and from their homes"); *see also Rowe v. Everett,* 2000 WL 1655233, at *5 (Del.Ch. Oct.25, 2000) (finding a prescriptive easement where affidavits indicated that the use was not permissive).

**32.** *Null v. Williamson,* 166 Ind. 537, 78 N.E. 76, 78 (1906); *see also Kilburn v. Adams,* 48 Mass. (7 Met.) 33 (Mass.1843) ("The question is, whether the plaintiffs [acquired a right of way by prescription]. The rule we think is,

that where a tract of land, attached to a public building, such as a meeting-house, town house, school house, and the like, and occupied with such house, is designedly left open and unenclosed, for convenience or ornament, the passage of persons over it, in common with those for whose use it is appropriated, is, in general, to be regarded as permissive, and under an implied license, and not adverse. Such a use is not inconsistent with the only use which the proprietors think fit to make of it; and therefore, until they think proper to enclose it, such use is not adverse, and will not preclude them from enclosing it, when other views of the interests of the proprietors render it proper to do so. And though an adjacent proprietor may make such use of the open land more frequently than another, yet the same rule will apply, unless there be some decisive act, indicating a separate and exclusive use, under a claim of right. A regularly formed and wrought way across the ground, paved, macadamized, or graveled and fitted for use as a way, from his own estate to the highway, indicating a use distinct from any use to be made of it by the proprietors, would, in our opinion, be evidence of such exclusive use and claim of right. So would be any plain, unequivocal act, indicating a peculiar and exclusive claim,

the case where a landowner has maintained a road, and has acquiesced in his neighbor's use. As the Nevada Supreme Court has explained:

> [Where] a roadway is established or maintained by a landowner for his own use, the fact that his neighbor also makes use of it, under the circumstances which in no way interfere with use by the landowner himself, does not create a presumption of adverseness. The presumption is that the neighbor's use is not adverse but is permissive, and the result of neighborly accommodation on the part of the landowner.[33]

These precedents, further, are in full accord with well established law supporting the proposition that neighborly or friendly use of land, whether a roadway, open land, or otherwise, does not establish an adverse use.[34] Simply put, taking neighborly acquiescence for the kind of laxity required for the establishment of a prescriptive easement is not a rule in accordance with the law of this state.

In this case, there is no evidence in the record to suggest that the Owners' use of the Strip was anything other than permissive. To the extent that the evidence weighs in one direction or the other, it shows unequivocally that the Owners were allowed to use the Strip, in common with the general public, as a neighborly gesture, and because, as a matter of convenience, the Club felt that it would be otherwise too difficult to differentiate between welcome visitors to the playground and those parking alongside the Owners' homes. Nor did any evidence show that the Owners' use conflicted with the Club's or with Lisa's use. Rather, the Club always allowed the Owners to use the Strip with the implied understanding that, in the context of a confused and crowded parking situation in Dewey Beach, the Club maintained control over the land. That truth is amply testified to by the Club's letter to

open and ostensible, and distinguishable from that of others. But the fact that a particular track or line was a little more worn and marked by travel, than the general surface of the lot, or that the adjacent proprietor had occasionally leveled a spot gullied by the rain, could scarcely be regarded, independently of other proof, as indicative of a claim of right.").

33. *Wilfon v. Hampel*, 105 Nev. 607, 781 P.2d 769, 771 (1989). Similarly, the Georgia Supreme Court held, in a case involving a road on property which was used by claimants with the knowledge of the landowner, but without his express permission, that "an owner's acquiescence in the mere use of his road establishes, at most, a revocable license." *Eileen B. White & Associates, Inc. v. Gunnells*, 263 Ga. 360, 434 S.E.2d 477, 479 (1993). Courts have also held that a third party's use of an improved or maintained path are presumed permissive. 25 AM.JUR.2D *Easements and Licenses*, § 60 (2004); *Chen v. Conway*, 121 Idaho 1000, 829 P.2d 1349 (Id.1992). There is record evidence that the Club spent money on upkeep of the Strip. Tr. 80–81.

34. *See Brown v. Houston Ventures, LLC*, 2003 WL 136181, at *6 n. 30 (Del.Ch. Jan.3, 2003) (citing with approval cases from other jurisdictions in which this rule was announced); *see also Bookchin v. Maraconda*, 162 A.D.2d 393, 394, 557 N.Y.S.2d 46 (N.Y.App.Div.1990) ("[T]he relationship between plaintiffs and defendant as well as his predecessor in title 'was one of cooperation and neighborly accommodation,' from which permission may be inferred."); *Susquehanna Realty Corp. v. Barth*, 108 A.D.2d 909, 910, 485 N.Y.S.2d 795 (N.Y.App.Div.1985) ("As the record indicates that the general public used the subject area, the presumption of adverse use cannot be applied. Plaintiff must, therefore, prove that its use of the strip of land was hostile to that of the owners of the servient tenement in order to be granted an easement by prescription. However, the relationship between plaintiff and appellants' predecessor in title (appellants took title to the servient tenement in 1976) was one of cooperation and neighborly accommodation. Permission may be inferred from such a relationship."); 28A C.J.S. *Easements* § 44 (1996).

Watt offering him a sublease over the Strip, as well as by the fact that the Club has spent money to maintain the Strip as a viable way. That the Lions Club attempted to stop strangers from *parking* on the property next to the playground says nothing at all as to the Club's views on use of the Strip for driving. Indeed, the Club's willingness to engage that issue, and yet freely allow use of the Strip for driving, only further demonstrates that the Club was willing to extend the Owners the courtesy of driving over the Strip so long as that did not impede public access to the playground. The court thus concurs with the Master's finding that the Owners fell short of proving that their use was other than permissive.

■ Delaware law further requires that an adverse use leading to a prescriptive easement be exclusive in the sense that the right does not depend for its enjoyment on similar rights in others.[35] In order to establish an independent prescriptive right in a case where the use of such easement has been participated in by the general public, the individual user must perform some act to the knowledge of the servient owner clearly indicating his individual claim to the prescriptive use.[36]

Having decided that the Owners have failed to show that their use was genuinely adverse, the court need not necessarily decide whether the use was exclusive in the sense required to establish a prescriptive easement. Nonetheless, the court concludes that throughout the allegedly prescriptive period, the Owners' right to use the land was never exclusive against the general public.

First, the evidence of the permissive public use of the Strip here is overwhelming, unlike cases where the specific use was clear, and the public use a matter of a sparse record.[37] The public has long used the Strip, and whenever the Owners began using it, that use postdated that of the general public. More pertinently, the court's review of cases in which prescriptive easements have been found despite concurrent public use demonstrates that those cases have often involved some distinctive, determinative facts, such as the existence of a sign reserving the use for the specific claimant,[38] the specific claimant's belief that he had purchased the adverse use from a previous owner,[39] or the

---

35. *Anolick,* 787 A.2d at 741 n. 15; 28A C.J.S. *Easements* § 38 (1996).

36. *Id.*

37. *Marta,* 22 A.2d at 521; *see also Burks Bros. v. Jones,* 232 Va. 238, 349 S.E.2d 134, 139 (1986) (holding that an exclusive use existed where there was "no evidence of any use by the general public"). The *Burks* court went on to observe that a use was exclusive only where it is "proprietary, not a use by the public generally, and is exercised under some claim which is independent of and does not depend for enjoyment upon similar rights by others." *Id. Compare Stanley v. Mullins,* 187 Va. 193, 45 S.E.2d 881, 884–85 (1948) (holding that a prescriptive use was not exclusive where the general public had used the way for some 60 years, and "no independent or proprietary right has been exercised or claimed by any of the complainants").

38. See, for example, *Saunders Point Ass'n v. Cannon,* 177 Conn. 413, 418 A.2d 70 (1979), where a Connecticut court decided that a club's adverse use of a beach was exclusive against the general public, and thus established a prescriptive easement, where the club had placed a sign near the beach making its own claim to the use.

39. *See, e.g., Klar Crest Realty, Inc. v. Rajon Realty Corp.,* 190 Conn. 163, 459 A.2d 1021 (1983) (holding that a prescriptive easement existed in favor of a particular adverse user where the plaintiff believed he had purchased the right to the adverse use from his predecessor in interest).

claimant's effort to add something physical to the public use that made it his own,[40] which differentiated the specific use from the general. There is simply no evidence of that kind anywhere in this record. Rather, the Owners place all their reliance on the fact that they turn right off the Strip to reach their homes, rather than turning left to park at the playground. But the Owners have cited no precedent which supports their novel position. Rather, as seems clear, and as the Master correctly held, the facts in this case demonstrate only that the Owners have long benefitted from a right of way used by the general public, upon whose use the Owners relied for their slightly different use. If this court had concluded that the public's use was adverse, which it does not, it is the public and not the Owners who would have had the legitimate claim.[41]

## VI.

In sum, the court finds that the Owners have failed to prove that their use of the Strip in order to access their homes was either not permissive, or exclusive against the general public. For those reasons, the Owners' exceptions to the Master's report are DENIED. Counsel for the Lions Club is directed to submit a form of final judgment, upon notice, within 15 days of the date hereof.

---

40. *Kilburn*, 48 Mass. at 38–39 ("a regularly formed and wrought way across the ground, paved, macadamized, or graveled and fitted for use as a way ... indicating a use distinct from any use to be made of it by the proprietors would ... be evidence of [a sufficiently exclusive use] and claim of right"). To the extent the court credits Pearl Golden's testimony that she had work done on the Strip, Pl.'s Opening Br. Ex. D, Golden Dep. 32–35, this was done only in the 1990s, and cannot establish a prescriptive easement now.

41. *Brosius–Eliason Co. v. DiMondi*, 1991 WL 242640 (Del.Ch. Nov.15, 1991) (considering whether the public had acquired an easement by prescription over disputed property); *Amer*, 1994 WL 279981, at *6 (considering whether a claimant acquired a prescriptive right by virtue of public use); Am.Jur.2d *Easements and Licenses*, § 40 (2004). Generally speaking, the claim of a public prescriptive right is brought by an agent of the public. *See, e.g., Town of Manchester v. Augusta Country Club*, 477 A.2d 1124 (Me.1984) (holding that a town, as a legally organized political entity, may lay claim to a non-possessory interest in land on behalf of the public at large).

