**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PATRICIA A. TUMULTY, MICHELE B. LYNCH, DANNI A. LYONS, STEPHEN J. TUMULTY, CHRISTINE SARLI and BERNICE TUMULTY, | ) ) ) ) ) | C.A. No. 5948-VCP |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JAMES RICHARD SCHREPPLER, | ) ) | |
| Defendant. | ) | |

**OPINION**

Date Submitted: December 18, 2014
Date Decided: March 30, 2015

John A. Sergovic, Jr., Esq., SERGOVIC, CARMEAN & WEIDMAN, Georgetown, Delaware; *Attorneys for Plaintiffs.*

John H. Newcomer, Jr., Esq., MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendant*.

**PARSONS, Vice Chancellor.**

In this adverse possession case, the defendant boldly attempts to claim ownership of nearly fifteen acres of woodland property previously listed as having unknown ownership, which he discovered while boating. Although this case rests on the outermost fringes of satisfying the adverse possession standard, for the reasons that follow, I conclude that the defendant has made out his claim. This is the Court's post-trial Opinion.

## I.     BACKGROUND

Plaintiffs, Patricia Tumulty and her five children—Michele B. Lynch, Danni A. Lyons, Stephen J. Tumulty, Christine Sarli, and Bernice Tumulty—filed this action against Defendant, James Richard Schreppler, alleging that he interfered with the quiet enjoyment of their property and slandered their title. Plaintiffs also requested declaratory relief that they are the legal and rightful owners of the land in dispute and asked this Court to remove a cloud over their title.[1] Initially, William B. and Susan M. Wilgus also were named as defendants in this action, but they were dismissed pursuant to a stipulation reached during trial. Defendant Schreppler counterclaimed and requested a declaratory judgment that he had acquired the lands in dispute by adverse possession.

---

[1] There is some dispute as to which of the Plaintiffs actually has an interest in the land, because the children purportedly conveyed their interest in the relevant land to their mother, Patricia Tumulty. Because all of the Tumultys filed suit as co-plaintiffs, however, any dispute on this point is one among Plaintiffs, which they have not asked the Court to resolve, and is not the focus of this Opinion.

## A.      Facts

This is the tale of a landlocked, wooded, and partially submerged parcel of land in Sussex County, Delaware.  The roots of this dispute can be traced to an errant survey that resulted in the land being listed in certain public records as having the status of "owner unknown."  The present case, however, resulted from a disagreement between Defendant and a third party over a stormwater-outfall pipe.

### 1.      The disputed property

It is helpful, first, to describe the land in dispute.  On or about June 1, 1971, James Tumulty, husband of Patricia,[2] acquired land in Dagsboro Hundred in Sussex County. The deed that conveyed that land (the "Workman II Deed") contains no metes and bounds descriptions, but purports to convey "thirty (30) acres of land, more or less."[3] Title can be traced back to an 1844 Orphans' Court proceeding.[4]  James passed away on January 16, 1985.[5]  The land passed to Plaintiffs under Delaware's intestacy laws.[6]

In a letter dated February 22, 1990, Melvin L. Joseph wrote to Patricia in an attempt to enforce a fifteen-year old development agreement between him and James

---

[2]      Throughout this Opinion, first names occasionally are used to avoid confusion. No disrespect or familiarity is implied.

[3]      JX 10.

[4]      JX 50.

[5]      Joint Stipulation 2(g).

[6]      Tr. 66 (Schab).  Citations to the trial transcript will be cited as "Tr. # (X)," with the witness "X" identified if not apparent from the text.

regarding the thirty acres.[7] William Schab, Patricia's attorney at the time, testified at trial regarding the subsequent series of events. Although Schab believed the development agreement to be unenforceable, Joseph threatened legal action. The Tumultys wished to avoid the expense and hassle of a lawsuit.[8] As a result, they agreed to sell the land to Joseph. Negotiations dragged on for about two years.[9] One sticking point was the size of the property. Although the Workman II Deed stated 30 acres, more or less, a survey commissioned by Joseph (the "1990 Land Tech Survey") found the land to be only 21 acres.[10] Eventually, the parties reached an agreement that involved selling the land for $60,000. The Tumulty children conveyed their interests in the land to Patricia on January 29, 1992,[11] and on April 1, 1992, she conveyed the land to Lakeview Estates, Inc., the corporate entity established by Joseph to develop the property.[12] I will refer to the property conveyed by Patricia as the "Former Tumulty Lands."

As it turned out, the 1990 Land Tech Survey mistakenly excluded a portion of the land that James owned. In 2008, a survey commissioned for Patricia, but, as described *infra*, apparently not ordered or paid for by her, indicated that the lost piece of land

---

[7] JX 24.

[8] Tr. 67-69.

[9] *Id.* at 69.

[10] JX 12.

[11] JX 13.

[12] JX 14.

contained some 14.74 acres (the "2008 Tumulty Survey"),[13] which is the land in dispute in this case (the "Property").[14] For ease of understanding, this Opinion includes a diagram of the Property at the end, entitled Annex I, which schematically depicts the Property and adjoining land. Aside from possible waterway access, the Property is landlocked in that there is no connecting road or point of access over land except through

[13] JX 19.

[14] As the following pages will show, Schreppler originally claimed possession of more of the land than is shown on the 2008 Tumulty Survey. In a previous case involving Schreppler's claims, *ABC Woodlands, L.L.C. v. Schreppler*, 2012 WL 3711085 (Del. Ch. Aug. 15, 2012), I adjudicated the boundaries of certain land held by ABC Woodlands, L.L.C. ("ABC Woodlands") a neighboring landowner. Plaintiffs maintain that the holding of that case creates an impermissible gap between the Tumultys' lands and ABC Woodlands's property. That gap, represented as a patterned rectangle in Annex I and referred to henceforth as the "Adjacent Parcel," is a piece of land consisting of roughly three-quarters of an acre. Plaintiffs ask the Court essentially to reform their boundaries vis-à-vis ABC Woodlands to the west and Collins Acres, LLC, to the north pursuant to a boundary-line agreement entered into by those parties. JX 22. Schreppler, however, counterclaimed against the Tumultys' efforts to eject him from their property. Neither the Collinses, their business entity, nor ABC Woodlands is a party to these proceedings. As this case is only adjudicating Schreppler's adverse possession claims against the Tumultys, the dispute over the purported gap is not properly before the Court. Accordingly, I decline the parties' respective invitations to adjudicate the Tumultys' right to that parcel, or Schreppler's adverse possession claims as to it, or both. While this may appear inefficient—and the Court does not relish a third case about Schreppler's claims, *i.e.*, *Collins Acres G.P. v. Schreppler*, Civ. A. No. 6916-VCP—the relevant title owners are necessary parties to such disputes.

4

neighboring property.[15] In terms of topography, the Property is heavily wooded, with some deer paths.[16]

### 2. Schreppler stakes a claim

Schreppler testified at trial about the activities that he has engaged in over the years on the Property. I found his testimony, like that of most of the other witnesses, credible. Some of Schreppler's testimony is corroborated by other witnesses. Moreover, with the possible exception of the "No Trespassing" signs, discussed *infra*, the material facts relevant to this dispute are largely uncontroverted.

### a. 1985-1992

In May or June of 1985, Schreppler discovered land near the Property while boating on Martin Mill Pond.[17] Initially, Schreppler explored the lands south of the pond.[18] He returned about two weeks after his initial visit to explore the southern lands further.[19] Interested in hunting the property, Schreppler went to the local tax office in late June or early July to identify the owner. The tax records for Parcel 38, which

---

[15] Tr. 585 (Schreppler).

[16] *Id.* at 596.

[17] Tr. 581-82.

[18] Schreppler's claims to the land south of the pond were disposed of in the *ABC Woodlands* case when he dismissed his adverse possession claims by stipulation. Thus, the land south of Martin Mill Pond is not at issue in this case.

[19] *Id.* at 582.

5

included the land in question, listed it as either "unknown owner" or "owner unknown."[20] It was at this time that Schreppler realized that Parcel 38 extended north, above the pond, and encompassed the Property at issue in this case. He returned to the area again in July 1985 and explored both the southern and northern portions, including the Property.[21]

Around this time, Schreppler determined to claim the Property, and other lands not at issue here, as his own. Although unfamiliar with the legal concept of adverse possession, he had heard of "squatter's rights," which he understood to be the ability of someone to claim abandoned land as their own.[22] Schreppler considered the boundaries to his claimed land to be consistent with the lines of Parcel 38 on the tax map. The western boundary was readily identifiable because the ABC Woodlands property, which was "under timber management," had neatly lined rows of trees replacing previously harvested trees. The northern boundary abutted a farm field, and the southern boundary corresponded to the pond. Schreppler stated that he could not demarcate the eastern boundary initially.[23]

In this early period, Schreppler's use of the Property steadily increased both qualitatively and quantitatively. In 1985, he visited the Property twelve times. During these visits, Schreppler fished or "patrolled" the land, which presumably means he hiked

---

[20]    JX 33. This exhibit apparently is not the same tax map that Schreppler viewed, but he confirmed that the parcels were identical. Tr. 583-85.

[21]    Tr. 585-86.

[22]    *Id.* at 586.

[23]    *Id*. at 587-88.

it.[24]  In 1986, Schreppler established the first of two camps on the Property.  The first camp was built on the Adjacent Parcel.  Two years later, Schreppler built a second campsite in the middle of the Property, on what the parties have referred to as "the peninsula."[25]  The campsites consisted of four-sided aluminum tents, fire pits, square folding tables, and folding chairs.  Additionally, Schreppler kept wooden pallets on the Property on which he would keep a trunk or two to store his equipment, such as cooking gear.  Tarps were placed under the tents or over the trunks, depending on the weather.  Additionally, he used a lot of mothballs to keep insects and snakes away.[26]

Starting around the time he installed the 1986 campsite, Schreppler testified that he began visiting the Property weekly.[27]  He described the Property as his "weekend getaway," and would stay for as long as two nights at a time.[28]  These visits involved camping, squirrel or deer hunting in the fall, and fishing.  The deer hunting required the addition of ladder stands to the Property.  Schreppler's duck hunting included installation of at least one "burlap and sticks" duck blind near the peninsula camp, as well as some duck boxes.[29]  Sometimes the duck blind would be left standing; otherwise, Schreppler

---

[24]    *Id.*

[25]    *Id.* at 597.  Annex I shows the approximate location of these campsites.

[26]    Tr. 600-01.

[27]    *Id.* at 597.

[28]    *Id.* at 601.

[29]    *Id.* at 598-600, 604.

7

would take it with him when he departed or store it in one of his trunks on the Property.[30] Additionally, Schreppler widened the main deer path that ran from the Tumultys' land to the Property and created a few smaller side trails that went to the water and other areas on the Property.[31]

These activities continued at this rate of roughly once a week until 1992. Schreppler listed five friends that visited the Property with him at various points during the pre-1992 time period. One of those individuals, Joseph Phillips, testified that he visited the Property to camp and fish with Schreppler on twenty to thirty occasions in the 1986 to 1988 or 1989 timeframe.[32] Phillips apparently camped exclusively on the Adjacent Parcel.[33] This camping occurred in lengths of time from overnight up to, on one occasion, a week. Phillips described the Property as difficult to access.[34]

Schreppler also testified to his limited posting of "No Trespassing" signs, or other signage of similar language. He posted such signs on the Property around 1986: (1) along the main deer trail from the Former Tumulty Lands "[w]here the wood starts to get thick again as you walk west and the trail starts";[35] (2) in the pond area;[36] (3) toward the

---

[30]    *Id.* at 600.

[31]    *Id.* at 605.

[32]    *Id.* at 562-63.

[33]    *Id.* at 568-70.

[34]    *Id.* at 565-66, 574.

[35]    *Id.* at 608-09.

8

western boundary adjoining ABC Woodlands;[37] and (4) by the camp.[38] Phillips testified to a sign at the pond that would be visible if arriving by canoe, but the exact location of that sign is unclear.[39] In general, there is little evidence corroborating Schreppler's posting of signage. I find that Schreppler probably did post such signs, but the record does not indicate their specific locations on the Property, or how long the signs stayed on the trees.

In addition to these physical acts of possession, Schreppler took some legal steps to shore up his claims in the fall of 1990. On November 3, 1990, he had a quiclaim deed prepared by William Wilgus by which Susan Wilgus "conveyed" the land identified on the tax map as parcel number 1-33-19.00-38.00 to Schreppler for one dollar (the "Wilgus Deed").[40] That deed was recorded on November 5, 1990.[41] The parties have stipulated that the Wilgus Deed conveyed no legal or equitable interest to Schreppler,[42] nor could it have. Susan Wilgus did not claim to have any interest in the Property and the Wilgus Deed was only a "straw deed." The purpose of a straw deed, as explained by Richard E.

---

[36]     *Id.* at 609.

[37]     *Id.* at 610.

[38]     *Id.* at 611.

[39]     *Id*. at 574.

[40]     *Id.* at 589.

[41]     JX 17.

[42]     Joint Stipulation 2(d).

9

Johnson, a cadastral mapping specialist employed by Sussex County, is to show an "intent to create a chain of title for property."[43] On November 7, 1990, in connection with recording the Wilgus Deed, Schreppler also assumed property tax responsibility for the Property and paid back taxes back to 1977.[44]

This relatively early portion of the relevant time period also includes some of the only evidence regarding the Tumulty children's contact with their father's property. In general, none of the children knew the boundaries of James's property, nor did most of them provide helpful explanations of exactly what they did or where they went when they visited. Most of these visits reference a "shack" or "cabin" that James had on the Former Tumulty Lands. County Road 412 intersects that land at its northeastern corner. Like the Property, the Former Tumulty Lands were bounded by Martin Mill Pond on the south. The northeastern corner of James's land was 966.93 feet from the western boundary of the Former Tumulty Lands, which is the eastern boundary of the Property.[45] Although not entirely clear from the record, the testimony generally indicates that the cabin is close to County Road 412.[46] All four of the Tumulty children who testified stated consistently

---

[43] Tr. 29. The term "cadastre" is defined, in relevant part, as: "A survey and valuation of real estate in a county or region compiled for tax purposes." BLACK'S LAW DICTIONARY 230 (9th ed. 2009). Presumably, then, a "cadastral mapping specialist" is a person specializing in mapping real property, particularly for the purpose of making tax maps.

[44] Tr. 590-92; JX 61.

[45] JX 12. Annex I attempts to portray this situation.

[46] Tr. 106 (Bernice Tumulty: shack about "50 to a hundred feet from the roadway").

10

that none of them saw any signs of human activity, such as duck blinds or deer stands, and none of them observed any "No Trespassing" or similar signage on the land they traversed. I find this testimony credible. The problem, however, is that this testimony is of quite limited relevance because none of the Tumulty children actually appears to have set foot on the Property. Rather, they were near it and may have been able to see some of it.

Bernice Tumulty, the youngest Tumulty child, visited the Former Tumulty Lands in 1990 with her husband. According to Bernice, the two of them "drove around . . . the area. We got out. We walked around into . . . the land."[47] Stephen Tumulty, the second oldest Tumulty child, visited the Former Tumulty Lands once or twice during the 1980s, though it is unclear when, and then in June 1990 with his wife.[48] He has hunted for thirty years and, during the 1990 visit, followed a deer path to "the swampy areas where the lake was."[49] Stephen did not see any deer stands or man-made trails during his visit of roughly one hour.[50] On cross-examination, Stephen testified that he went a couple of hundred yards into the woods, perhaps as far as a thousand feet.[51] If his hike into the

---

[47]     *Id.* at 95.

[48]     *Id.* at 119. Stephen described the 1990 visit at trial, but did not provide any details for the visit (or visits) in the 1980s.

[49]     *Id.* at 113.

[50]     *Id.* at 114.

[51]     *Id.* at 121-22.

11

woods were as the crow flies, Stephen may have entered the Property by about thirty feet, assuming he were walking west, not south, which is not established in the record.

Danni Lyons, the second youngest Tumulty child, visited the property in 1987. She testified that her visit lasted about an hour and estimated that she walked one or two football fields. But, she later stated that she was not sure how far she went and may have walked a thousand feet.[52] Michele Lynch, the oldest Tumulty child, testified last. She visited the property in the summer of 1990 along with her husband, their children, and Bernice.[53] At trial, she testified that their group walked "all over" the property.[54] By her estimate, they walked about ten acres of the property.[55] This response, however, is inconsistent with her deposition testimony, where she testified that they "couldn't go back too far because there was a lot of brush. It was thick and swampy."[56] At the deposition, she also stated that she had no idea how far back she went.[57] Even aside from

---

[52]    *Id.* at 129. I take judicial notice of the fact that a football field is approximately 300 to 360 feet long, depending on whether one includes the two end zones.

[53]    *Id.* at 148.

[54]    *Id.* at 150.

[55]    *Id.*

[56]    *Id.* at 168.

[57]    *Id.* at 169. Plaintiffs clearly anticipated this impeachment, because their counsel asked both on direct and redirect whether Michele had reconsidered her trip to the Former Tumulty Lands since her deposition. *Id.* at 149, 170.

the credibility issues arising from the impeachment, I find that Michele's testimony was too ambiguous to be reliable.[58]

The foregoing represented the only evidence Plaintiffs presented as to any contact they had with the Property before the mid-2000s. Based on that evidence, I find that Plaintiffs have failed to show that any of them visited or walked over a material portion of the Property during that time period. At best, the record suggests Stephen may have stepped onto a very small segment of Property around its eastern boundary by roughly ten yards. Overall, I did not find the testimony of the Tumulty children useful in resolving Schreppler's adverse possession claims.

### b.      1992-1994

Schreppler's usage of the Property shifted beginning in 1992. "By 1992, there was an insect problem out there [on the Property], as far as parasites went, that made it undesirable in the summer months to camp."[59] Accordingly, Schreppler removed his

---

[58]     Michele arrived at her trial testimony regarding "distance" by comparing it to the distance up the street her own half-acre lot is. An acre, however, is a unit of measurement for area, not distance. Thus, even assuming her testimony was entirely accurate, it still would not be clear how far into the woods she traveled, much less in what direction. For example, there are 43,560 square feet in an acre, and a half-acre would be 21,780 square feet. Assuming a perfectly square lot, the length of each side would be the square root of the area. For this hypothetical square lot, each side would be about 147.6 feet. If Michele's half-acre lot were a square lot, and she walked an estimated twenty such lots, then she would have traveled 2,952 feet. The record, however, contains no evidence as to the shape of Michele's lot. If it were a 50' by 436' rectangle, she would have walked either a thousand feet, consistent with what Stephen did, or about 8720 feet, nearly a mile and two-thirds.

[59]     Tr. at 602 (Schreppler).

long-term camp sites, but would still day-camp on occasion, as well as engage in fishing and some hunting.[60] His visits fell by more than half and he would use the Property perhaps twenty times a year, as opposed to on nearly a weekly basis. This rate of usage continued throughout the 1990s.[61] There was, however, a brief effort in 1994 to re-establish a camp on the Property. That undertaking lasted about six months and it is unclear whether Schreppler visited the Property more frequently during those months.[62]

During the early and mid-1990s, the usage of the land surrounding the Property began to change. The northern boundary continued to border a farm field, but the Former Tumulty Lands were now under development. The Record Plat of Lakewood Estates II was recorded on November 18, 1992. That document listed the western adjoining lands, *i.e.*, the Property, as being owned by Schreppler.[63] As time progressed, the Former Tumulty Lands were cleared of forest and prepared for development as a residential neighborhood. At least some of that construction was completed by 1994. That facilitated Schreppler's brief attempt to reestablish his overnight camp, because he could drive on the now-paved road to about twenty feet from the eastern boundary of the Property.[64]

---

[60]     *Id.* at 603.

[61]     *Id.* at 606.

[62]     *Id.*

[63]     JX 57.

[64]     Tr. 605.

14

### c.      1995-2005

After 1994, Schreppler no longer had any campsites and he removed or otherwise let deteriorate his duck blinds and deer stands,[65] but he continued visiting the property to hunt, fish, day-camp, and hike about twenty times annually.[66] Sometime during the mid-1990s, as the development of Lakewood Estates continued, Schreppler posted more "No Trespassing" signs somewhere along the eastern boundary of the Property.[67] These signs were nailed to trees and remained until they wore out from the weather.[68] Moreover, the signs were not directly on the boundary line, but some distance into the woods. According to Schreppler, he did not post immediately along the eastern boundary line so as not to offend his new neighbors.[69] The record contains virtually no corroboration of the existence of these signs. In addition, their specific locations are unclear, and the length of time they remained posted is uncertain.

The Collinses, either individually or through a business entity, own land north of the Property. They farmed that land from 1983 until 2004, when they began developing some of that property into Deere Country, a new residential area.[70] Steven Short lives

---

[65]     *Id.* at 646.  Two duck boxes may have remained on the Property.  *Id.* at 647.

[66]     *Id.* at 606.

[67]     *Id.* at 611.

[68]     *Id.* at 639-40.

[69]     *Id.* at 666.

[70]     *Id.* at 176 (Collins, Jr.), 258 (Collins, Sr.).

15

northeast of the Property and across from both what is now Deere Country and Lakewood Estates. He purchased that land from the Collinses and moved there in 1996.[71] In 1997, he requested permission from the Collinses to hunt on what is now Deere Country land, which they granted.[72] Short hunted in or around that area two times. On at least one of those occasions, he went about twenty yards onto the Property entering from the north, and he installed a deer stand there. Sometime later, he returned to find the stand removed and a "No Trespassing" sign posted instead.[73] A conflict exists in the trial testimony as to what happened next. It is undisputed that Short did not return to hunt on the Property, because he did not want to trespass,[74] but according to Short he took the sign with him.[75] Schreppler testified that the sign remained posted.[76] I find it more likely that Short took the sign, but this dispute is immaterial.[77] Short further noted that, before seeing the sign posted beneath his deer stand, he had not seen any "No Trespassing" signs along the Deere Country border.[78] He did not venture further into the woods, however.[79] Leaving

---

[71]    *Id.* at 50-51, 57.

[72]    *Id.* at 57.

[73]    *Id.* at 54, 58.

[74]    *Id.* at 59.

[75]    *Id.* at 55.

[76]    *Id.* at 638.

[77]    *Id.* at 177 (Collins, Jr.: stating that Short showed him the sign).

[78]    *Id.* at 60.

16

aside the events relating to the outfall pipe on the Adjacent Parcel, discussed *infra*, there is no evidence in the record of any other acts of trespassing by third parties on the Property.

As time passed, Schreppler's usage continued as previously described, including the ongoing payment of taxes. Third parties continued to recognize Schreppler as the owner of the Property. On July 1, 1999, the Delaware Soil and Water Conservation Office requested permission in writing to perform a topographical survey,[80] which Schreppler granted on July 6.[81] On October 4, 1999, the Bell Flower Hunt Club requested permission in writing to hunt on the Property.[82] Schreppler granted that request on October 9, subject to certain conditions.[83] A second Record Plat of Lakewood Estates II was recorded on August 8, 2001, again listing Schreppler as owner of the Property.[84] And, the Collinses recorded a Preliminary Plan of Deere Country on January 7, 2003, which listed the land to the south as owned by Schreppler.[85]

---

[79]    *Id.* at 61.

[80]    JX 66.

[81]    JX 67.

[82]    JX 62.

[83]    JX 63.

[84]    JX 58.

[85]    JX 59.

During the development of Lakewood Estates, Doug Simpson, a timber buyer, was working for the developer, Melvin Joseph, near the eastern border of the Property. He testified that he did not see any human activity on the Property or any "No Trespassing" signs.[86] It is doubtful whether Simpson entered the Property on the eastern side.[87] If he did, he probably did not go much more than twenty yards beyond the Lakewood Estates boundary.[88] On April 29, 2005, Shawn Rogers moved into a house on a lot in Lakewood Estates adjacent to the Property.[89] He similarly testified that he did not see any "No Trespassing" signs along the border of the Property adjacent to him until 2011, when several were added.[90] Although Rogers has never set foot on the Property,[91] he has seen Schreppler on it hundreds of times.[92]

Tim Pulice requested permission in writing to hunt on the Property on November 10, 2005.[93] Schreppler granted this request as well.[94] At trial, Pulice confirmed that fact and testified that he had visited the Property with Schreppler approximately twenty

---

[86]     Tr. 331-32.

[87]     *Id.* at 376-77.

[88]     *Id.* at 383-85.

[89]     Tr. 33.

[90]     *Id.* at 33-34.

[91]     *Id.* at 45.

[92]     *Id.* at 44.

[93]     JX 64.

[94]     JX 65.

times.[95]   His recollection regarding any "No Trespassing" signs, which he believed probably were on the Deere Country boundary around 2006 or 2007, was hazy and of limited utility.[96]

### 3.      The outfall pipe incident

A dispute in 2005 between Schreppler and the Collinses set in motion a chain of occurrences that resulted, eventually, in the filing of this lawsuit by Plaintiffs.  As part of the development of Deere Country, the Collinses needed to install an outfall pipe for stormwater runoff.  In July 2002, the Collinses (Sr. and Jr.) visited Schreppler at his office and requested an easement across the Property for a drainage pipe.  Schreppler offered to grant the easement if they would provide him a right-of-way to access the Property.  At this meeting, the Collinses also inquired about purchasing the Property, but Schreppler was not interested in selling.[97]

The Collinses also approached other nearby landowners about securing an easement.  One of those individuals cautioned the Collinses against working with Schreppler because he did not have clear title to the land and was attempting to claim it

---

[95]     *Id.* at 478-79.

[96]     *Id.* at 481-82, 484-85.

[97]     *Id.* at 618-19 (Schreppler), 180-81 (Collins, Jr.), 258-59 (Collins, Sr.).

as a squatter.[98]  By this point in time in 2002, that fact apparently was widely known among nearby landowners.[99]

Relations between Schreppler and the Collinses soured over the following years.[100] On May 13, 2003, Schreppler's lawyer wrote to the Collinses to request right-of-way access to the Property.[101]  The record does not indicate whether the Collinses ever responded to this letter, but the right-of-way was not granted.  According to the minutes, at a meeting of the Sussex County Planning and Zoning Commission on May 22, 2003, Schreppler objected to the Collinses' proposed development of Deere Country unless he received a right-of-way to access the Property.[102]

Instead of dealing with Schreppler, the Collinses struck a deal with ABC Woodlands that resulted in a recorded easement between Collins Acres General Partnership ("Collins Acres") and ABC Woodlands dated June 28, 2004.[103]  Schreppler responded by having his own survey prepared on June 1, 2005.[104]  Based on this survey,

---

[98]   *Id.* at 259 (Collins, Sr.).

[99]   *Id.*

[100]   The final Record Plan of Deere Country, which was approved on November 5, 2004, actually omitted any reference to Schreppler's ownership claim, JX 83, despite the fact that the preliminary plan filed on January 7, 2003, listed him as the owner, JX 59.

[101]   JX 54.

[102]   JX 38.

[103]   Tr. 182-83 (Collins, Jr.); JX 26.

[104]   JX 15.

he took the position that the drainage easement in fact would be on his claimed lands and not solely on ABC Woodlands's property.[105] On August 16, 2005, Schreppler's counsel sent a letter to the Collinses informing them of his position and his intent to take action regarding the drainage pipe, which by then appeared to have been installed on his property.[106] Notwithstanding this threat, the Collinses opted not to remove the pipe.[107]

Sometime in December 2005, heavy rains caused flooding in Deere Country. The Collinses inspected the area to determine why the outfall pipe was not removing the rain water. Once they arrived on the Adjacent Parcel, they discovered that the outfall pipe had been dug up out of the ground.[108] The Collinses were advised by the Conservation District to fix the problem as quickly as possible.[109] They then promptly had the pipe reinstalled.[110] Schreppler's counsel noted this fact in another letter to the Collinses dated December 14, 2005.[111] Additionally, the Collinses filed a police report complaining about the destruction of the outfall pipe.[112]

---

[105]   In the terminology employed throughout this Opinion and as reflected in Annex I, the outfall pipe was placed on the Adjacent Parcel, rather than on the Property.

[106]   JX 45.

[107]   Tr. 187 (Collins, Jr.).

[108]   *Id.* at 198-99 (Collins, Jr.); JX 39 (photographs of the damage).

[109]   Tr. 251 (Collins, Sr.).

[110]   *Id.* at 200 (Collins, Jr.).

[111]   JX 49.

[112]   JX 43.

21

By this time, the Collinses and Schreppler clearly did not get along. On one occasion the two sides had a confrontation of sorts on the Adjacent Parcel during which Schreppler, who allegedly was squirrel hunting, was present with a shotgun and the Collinses informed him to stop trespassing on what they believed to be their easement.[113] The Collinses also posted "No Trespassing" signs around the area, which were removed.[114] Additionally, the Collinses' attorney sent a letter to Schreppler on December 13, 2005, telling him to stop trespassing on the easement.[115] Although Schreppler did not admit to removing the drainage pipe or the "No Trespassing" signs, the evidence strongly suggests that he did. The record shows, for example, that: (1) no one else had a motive to do so; (2) Schreppler's letter to the Collinses threatened to remove the pipe; and (3) Shawn Rogers saw Schreppler entering the Property with a tractor, equipment that would be necessary to dig up the drainage pipe.[116]

### 4. The Collinses strike back

After the stormwater pipe incident, Donald Collins, Jr. "went up to the county courthouse and start[ed] looking at the surrounding property owners and trying to research some of the deeds."[117] Simpson, the timber buyer, assisted with the effort.[118] Simpson did substantial work for ABC Woodlands and he also had worked with the

---

[113]    Tr. at 202-04 (Collins, Jr.); *id.* at 246 (Collins, Sr.).

[114]    *Id.* at 255-56 (Collins, Sr.).

[115]    JX 48.

[116]    Tr. 37-38 (Rogers).

Melvin Joseph estate.[119]  Simpson dedicated some 80-100 hours of time, all unpaid, toward helping research the various chains of title, including those of ABC Woodlands and the Tumultys.[120]  At trial, Simpson testified at length about how he believes the 1990 Land Tech Survey error occurred.[121]  As a result of this research, the Collinses determined that the Tumultys owned the Property.[122]

This information was provided to the Joseph estate so that they could purchase the Property from the Tumultys, if they so desired, in order to complete the Lakewood Estates project.[123]  James E. Moore, an attorney for the Joseph estate, contacted Patricia Tumulty by letter dated February 16, 2006, and made an offer for the Property.[124]  Sometime before sending the February 2006 letter, Moore made a field visit to the Property.  He provided no details whatsoever regarding this visit—including whether he actually entered the Property or just viewed it from afar—but testified that Schreppler's

---

[117]    *Id.* at 207.

[118]    *Id.* (Collins, Jr.).

[119]    *Id.* at 331 (Simpson).  Melvin Joseph passed away in late 2004 or early 2005.  *Id.* at 307 (Moore).

[120]    *Id.* at 332, 360.

[121]    *Id.* at 325-28, 334-36, 342-44.

[122]    *Id.* at 208 (Collins, Jr.).

[123]    *Id.*; *id.* at 282-84 (Moore).

[124]    *Id.* at 290-92; JX 18.

usage was not open or notorious,[125] by which he seems to have meant that there were no fences or houses on the Property.[126] In April 2006, Bernice Tumulty drove down to see the Property.[127] Although she testified that she saw no evidence of human activity, her testimony is too vague to be useful.[128] While negotiations between the parties continued, Moore ordered a survey of the Property on August 10, 2006.[129] The negotiations with the Tumultys lasted approximately two years, but the two sides could not agree on a price and no deal was reached.[130] When it became apparent that the Joseph estate was not going to purchase the Property, the Collinses entered into discussions with the Tumultys about purchasing it.[131] The Collinses' interest eventually diminished, however, and the negotiations terminated.[132]

---

[125]    Tr. 312.

[126]    *Id.* at 304.

[127]    *Id.* at 97-98 (Bernice).

[128]    It is unclear from Bernice's direct testimony whether she did anything more than drive to the adjacent cul-de-sac, near Rogers's home in Lakewood Estates, and look at the Property. *Id.* at 97-100. Her cross-examination also left doubts as to whether she was at the correct location. *Id.* at 107-08. Even assuming she was, however, Bernice provided no insight into whether she actually walked into the woods on the Property and, if so, how far.

[129]    JX 29.

[130]    Tr. 71-72 (Schab).

[131]    *Id.* at 209 (Collins, Jr.).

[132]    *Id.* at 210.

24

### 5.      Plaintiffs belatedly return

Patricia Tumulty retained counsel to deal with the Property on September 1, 2006, after negotiations with the Joseph estate had commenced.[133]   The record is curiously obscure as to what happened between September 1, 2006, and November 3, 2010, when Plaintiffs filed the initial complaint in this case.  A number of events relating to Plaintiffs' claim to title to the Property did occur, but Plaintiffs themselves had minimal involvement in them.  For example, the only event of note in 2007 was a confirmatory deed filed by Schreppler.[134]  Plaintiffs apparently were continuing to negotiate regarding sale of the Property in 2007, when that deed was filed.[135]

Several events occurred in 2008.  ABC Woodlands filed suit against Schreppler on February 27, 2008, over the lands south of the pond and the western boundary of the Property.[136]   A survey of the Property dated November 3, 2008, states that it was prepared for Patricia Tumulty.[137]  The Tumultys, however, did not order that survey.[138]  Instead, the 2008 Tumulty Survey, which was performed by Donald Miller, appears to

---

[133]      *Id.* at 83 (Schab); JX 52.

[134]      JX 20.

[135]      JX 81 and 82.

[136]      *ABC Woodlands, L.L.C. v. Schreppler*, 2012 WL 3711085, at \*1-2 (Del. Ch. Aug. 15, 2012).

[137]      JX 19.

[138]      Tr. 141 (Lyons).

25

have been commissioned and paid for by ABC Woodlands.[139]  Relying on that survey, as well as the title research from Simpson, Donald Collins, Jr. went to the Sussex County tax office, along with Miller, to have the taxes for the Property reassessed from Schreppler to Patricia Tumulty.[140]  Richard Johnson of the tax office testified that, based on the information they presented, the taxes were reassessed to the Tumultys on November 19, 2008 (the "2008 Reassessment").[141]  No one informed Johnson of the ongoing dispute over the Property or contacted Schreppler.[142]  Johnson reached out to Patricia Tumulty by telephone so that she would not be surprised when the tax bill arrived.[143]  Schreppler learned of the 2008 Reassessment in 2010 and attempted to have the taxes assessed back to him, but his request was not granted.[144]

On April 8, 2009, the Tumultys, the Collinses, ABC Woodlands, and various others entered into a boundary line agreement (the "Boundary Line Agreement").[145]  The 2008 Tumulty Survey in fact constitutes a small piece of the larger ABC Woodlands surveying work that became the Boundary Line Agreement, but the boundaries of those

---

[139]    *Id.* at 452-53 (Miller); *id.* at 209-10 (Collins, Jr.).

[140]    *Id.* at 209.

[141]    *Id.* at 7-9.

[142]    *Id.* at 19, 24.

[143]    *Id.* at 13.

[144]    *Id.* at 635.

[145]    JX 22.

surveys are consistent.[146]  Again, the Tumultys did not take a proactive role in securing the Boundary Line Agreement; instead, it was presented to them by the Collinses.[147] Aside from presumably paying the now-reassessed taxes, the Tumultys took no other action regarding the Property in 2009.  Similarly, they appear not to have taken any such action in 2010 until the filing of this lawsuit, with the exception of a conversation between Stephen Tumulty and Schreppler in late October 2010.[148]  Schreppler, however, continued to visit the Property about twenty times annually, as he has done since 1994,[149] and to use the Property in the manner previously described.

## B.    Procedural History

Plaintiffs filed their initial complaint against Schreppler and the Wilguses on November 3, 2010, two days before the twentieth anniversary of Schreppler's recording of the Wilgus Deed.  Schreppler answered on March 11, 2011, and asserted a counterclaim for adverse possession of the Property.  Plaintiffs amended and filed the operative complaint on October 25, 2013 (the "Complaint").  Schreppler again answered and counterclaimed for adverse possession (the "Answer and Counterclaims").

The Court presided over a three-day trial in this matter from March 11-13, 2014. Eighteen witnesses testified in person and the parties introduced approximately 85

---

[146]    Tr. 452-53 (Miller); *id.* at 235-36 (Collins, Jr.).

[147]    *Id.* at 156-57 (Lynch); *id.* at 210 (Collins, Jr.).

[148]    *Id.* at 118-19 (Stephen); JX 41.

[149]    *Id.* at 630 (Schreppler).

27

exhibits. During trial, the parties agreed to dismiss the Wilguses as defendants. I entered a formal stipulation of dismissal in that regard on June 20, 2014. After extensive post-trial briefing, the Court heard final argument on December 18, 2014.

## C. Parties' Contentions

The Complaint asserts four counts against Schreppler, not including an initial request for injunctive relief, for: (1) interference with control, use, and quiet enjoyment of property; (2) slander of title; (3) a declaratory judgment as to Plaintiffs' ownership of the property; and (4) removal of a cloud on Plaintiffs' title. The Answer and Counterclaims denied the primary allegations of the Complaint and asserted a counterclaim for declaratory judgment that Schreppler has acquired title to the Property by adverse possession. The Answer and Counterclaim also included a counterclaim asserting slander of title against Plaintiffs. Schreppler did not address his slander of title counterclaim in his post-trial briefing. I therefore deem it abandoned and waived.[150]

The key question requiring resolution is whether Schreppler has satisfied the elements of adverse possession. Plaintiffs contest each of the elements. Plaintiffs also contend that Schreppler is collaterally estopped from asserting adverse possession because of the *ABC Woodlands* case. Schreppler counters that Plaintiffs lack standing to pursue their claims.

---

[150]    *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

## II.    THE THRESHOLD ISSUES

### A.    Plaintiffs Have Standing

Schreppler argues that the deeds by the Tumulty children to Patricia Tumulty and then from Patricia to Lakeview Estates conveyed all of the land owned by James Tumulty—*i.e.*, the Former Tumulty Lands and the Property.  As such, Schreppler asserts that Plaintiffs lack standing to bring these claims.  Presumably, under this theory, Lakeview Estates legally would own the Property and should have sued Schreppler.

Schreppler focuses on the identical language in the relevant deeds stating: "Being the same property conveyed to James N. Tumulty by [the Workman II Deed]."[151] Relying on these "Being" clauses, Schreppler points to language in a previous Court of Chancery decision, *Forwood v. Delmarva Power & Light Co.*,[152] which reads: "Modern principles of deed construction also hold that a deed will be construed as conveying the entire estate or interest which the grantor owns unless a limitation is clearly expressed."[153]  In addition, Schreppler cites to the testimony of the Tumulty children that they intended in 1992 to convey all of the land they owned.[154]

The *Forwood* case is distinguishable, however.  That case primarily involved construing a series of conveyances to determine what interest a railroad acquired by

---

[151]    JX 13, JX 14.

[152]    1998 WL 136572 (Del. Ch. Mar. 16, 1998).

[153]    *Id.* at *6.

[154]    *E.g.*, Tr. 123 (Stephen); *id.* at 139 (Lyons).

29

condemnation during the Rutherford B. Hayes administration, what interest a subsequent title holder conveyed near the beginning of Theodore Roosevelt's presidency, and then whether Delmarva later acquired a prescriptive easement. The relevant deed language in that case specifically included a reference to the railroad right-of-way.[155] Here, by contrast, although the 1992 Tumulty deeds purport to convey all of the lands owned by James Tumulty, those deeds are internally contradictory, because they include metes and bounds descriptions in accordance with the 1990 Land Tech Survey.[156] Thus, while the Tumultys may have intended to convey all the lands they owned, the deeds indicate that they thought they owned only the roughly 21.77 acres identified in the errant 1990 Land Tech Survey, which does not include the Property.

Ambiguities in grants are resolved in favor of the grantees, unless such a construction would be contrary to the intention of the parties.[157] The most reasonable interpretation of these deeds is that all of the parties were operating under the assumption that the land being conveyed was that land identified specifically by the metes and bounds recited in the deeds, which comported with the 1990 Land Tech Survey. Put simply, both sides mistakenly believed that the lands identified by the metes and bounds were the entirety of James's land. For example, upon being informed by the Collinses that the Tumultys had title to the Property, Lakeview Estates did not take the position that

---

[155]   *Forwood*, 1998 WL 136572, at *6-7.

[156]   JX 13, JX 14.

[157]   *Forwood*, 1998 WL 136572, at *5.

30

it, in fact, owned the land, but instead concluded that the Tumultys had not conveyed that land to it in 1992. This fact is evidenced by the subsequent effort of the Joseph estate to purchase the Property from the Tumultys.

There is no ambiguity such that the deed should be construed in favor of the grantee Lakeview Estates. Rather, the deed contains an internal contradiction. The actions of Lakeview Estates, via the Joseph estate, and the Tumultys confirm that their intention in 1992 was to convey the lands identified by the metes and bounds descriptions, in line with the flawed 1990 Land Tech Survey and notwithstanding the general "Being" clause in the deeds. Thus, legal title to the Property arguably remained with the Tumultys following the sale to Lakeview Estates. Any dispute about which of the Tumultys is the proper party in interest, however, need not be resolved, because all of them are named Plaintiffs in this action.[158] The Tumultys' interest in this case, therefore, suffices to afford them standing to pursue their claims against Schreppler.

### B.      Collateral Estoppel Does Not Apply

Plaintiffs rather confusingly contend that the outcome of the *ABC Woodlands* proceedings should bar Schreppler's adverse possession claims here. In *ABC Woodlands*, Schreppler entered into a stipulation to dismiss with prejudice his adverse possession claims against ABC Woodlands as to the lands south of Martin Mill Pond.[159] I am not

---

[158]      *See supra* note 1.

[159]      *ABC Woodlands, L.L.C.*, 2012 WL 3711085, at *2. Annex I includes a notation to this effect.

31

persuaded that Schreppler's stipulation in *ABC Woodlands* precludes him from pursuing his claims in this action.

"Collateral estoppel, also known as issue preclusion, prevents a party who litigated an issue in one forum from later relitigating that issue in another forum."[160] The elements of collateral estoppel in Delaware are well established: "Collateral estoppel applies if: (1) the same issue is presented in both actions; (2) the issue was litigated and decided in the first action; and (3) the determination was essential to the prior judgment."[161]

None of the elements of collateral estoppel are met here. Admittedly, both this case and *ABC Woodlands* involved an adverse possession counterclaim, but the counterclaims pertain to different pieces of land. Thus, the same issue is not present in both cases. Furthermore, Schreppler stipulated to the dismissal; the issue was not litigated and the Court made no determination as to the validity of Schreppler's adverse possession claims. And, finally, aside from the fact that there was no "determination," the stipulation of dismissal was not essential to the prior judgment; to the contrary, it had no effect on that judgment.

---

[160] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *11 (Del. Ch. Oct. 31, 2014).

[161] *Zutrau v. Jansing*, 2014 WL 3772859, at *41 (Del. Ch. July 31, 2014).

Indeed, Plaintiffs themselves note in their brief that "the Court in the *ABC Woodlands* proceeding did not adjudicate Defendant Schreppler's adverse possession claim."[162] This concession alone defeats Plaintiffs' collateral estoppel argument.

## III.   ADVERSE POSSESSION

I previously referenced the temporal gap between Plaintiffs receiving notice in 2006 that they arguably still owned the Property and the filing of this lawsuit over four-and-a-half years later. As the following analysis shows, that delay may have been outcome-determinative. At a minimum, it contributed significantly to the present Opinion being adverse to Plaintiffs. Because I conclude that Schreppler has satisfied the standard for adverse possession, title to the Property is his and the other counts in Plaintiffs' Complaint are moot.

### A.   Standard of Review

"The elements of a valid claim to title through adverse possession are well established. Plaintiffs must show that they have had open, notorious, hostile, exclusive, adverse possession of land continuously for the prescribed period."[163] The open and notorious elements are considered together, as each term essentially is duplicative of the other.[164] Similarly, the hostile and adverse requirements are analyzed in tandem.[165] In

---

[162]   Pls.' Post-Trial Br. 54.

[163]   *Taraila v. Stevens*, 1989 WL 110545, at *1 (Del. Ch. Sept. 18, 1989).

[164]   *See, e.g.*, *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Ch. Aug. 31, 2007) (analyzing the element of "open and notorious").

Delaware, the prescribed period is twenty years.[166] Importantly—and somewhat surprisingly—the burden of proof for adverse possession is only a preponderance of the evidence, rather than clear and convincing evidence.[167] To establish title by adverse possession therefore, Schreppler must show, by a preponderance of the evidence: (1) open and notorious, (2) hostile and adverse, (3) exclusive, (4) actual possession, (5) that was continuous for twenty years. The evidence required to prove the five requirements overlaps significantly. Nevertheless, I address each of them, though somewhat out of turn in order to better frame the dispute.

### B.    Continuous

I begin with the element of continuous possession. I start here because the twenty-year requirement is a bright-line inquiry.[168] In terms of the continuousness requirement,

---

[165]    *See Ayers v. Pave It, LLC*, 2006 WL 2052377, at *3 (Del. Ch. July 11, 2006) (examining the presence of "adverse or hostile" possession).

[166]    10 *Del. C.* § 7901. Section 7901 essentially codifies the common law of adverse possession, although a reader unfamiliar with that body of law might not surmise as much based on the language of the statute. *Acierno v. Goldstein*, 2005 WL 3111993, at *2 n.23 (Del. Ch. Nov. 16, 2005).

[167]    *Ayers*, 2006 WL 2052377, at *2 (citing, *inter alia*, *Dickerson v. Simpson*, 792 A.2d 188 (Del. 2002) and *Philips v. State ex. Rel. Dep't of Natural Res.*, 449 A.2d 250, 255 (Del. 1982)). A preponderance of the evidence standard is used even though acquiring an easement by prescription requires proof by clear and convincing evidence. *Dewey Beach Lions Club, Inc. v. Longanecker*, 905 A.2 128, 134 n.27 (Del. Ch. 2006) (noting this "remarkabl[e]" discrepancy); *Ayers*, 2006 WL 2052377, at *2 (commenting on same and noting that a majority of states require proof by clear and convincing evidence for an adverse possession claimant to prevail).

[168]    *See Del-Chapel Assocs. v. Conectiv, Inc.*, 2008 WL 1934503, at *7 (Del. Ch. May 5, 2008) (rejecting adverse possession argument because possession period ran

the two key disputes are: (1) whether Schreppler's possession was interrupted sometime before the filing of this lawsuit on November 3, 2010; and (2) when Schreppler's possession began.

### 1. What is the relevant end date for analyzing Schreppler's claims?

Schreppler's claims stopped accruing when Plaintiffs filed this lawsuit on November 3, 2010. Plaintiffs point to numerous other incidents that allegedly tolled or interrupted his claims. None of these arguments is persuasive.

First, Plaintiffs argue that Schreppler's change of usage in 1992 constituted an abandonment and interrupted the adverse possession period. None of the evidence, however, suggests that Schreppler abandoned the Property. Indeed, he continued using it roughly twenty times a year from 1992 until the filing of this lawsuit. The Delaware Supreme Court previously has held that the "uninterrupted and continuous enjoyment of land to constitute adverse possession does not require the constant use thereof."[169] Even assuming that Schreppler had taken a short break from using the land at times during the 1992 to 1994 period—which is not borne out by the record—"[t]emporary breaks in cultivation, if such were the case, would not necessarily destroy the requisite

---

from October 1982, until filing of the lawsuit in March 2002, a period of less than twenty years).

[169]   *Lewes Trust Co. v. Grindle*, 170 A.2d 280, 282 (Del. 1961).

continuity."[170]   Indeed, there "must be an intention to relinquish the claim of ownership."[171]  No such evidence exists here.

Second, Plaintiffs argue that the placement of the outfall pipe in or around 2005 constituted an ouster of Schreppler or interrupted his claims.  This argument fails for at least the following two reasons.  First, the outfall pipe was placed on the Adjacent Parcel, which is not at issue in this case.[172]  And second, even if the Adjacent Parcel were in dispute here, the Collinses placed the outfall pipe.  That action had nothing to do with the Tumultys.  "Generally speaking, in order to interrupt the adverse possession period, *the true owner* must oust the adverse possessor, either by obtaining a judgment against the possessor or by entering the disputed property in a way that excludes him."[173]  Thus, the placement of the outfall pipe did not interrupt Schreppler's claims.

Third, I reject any argument that the 2008 Tumulty Survey (which was not done by, or at the behest of, the Tumultys), the 2008 Reassessment (which was not done by, or at the behest of, the Tumultys), or the 2009 Boundary Line Agreement (which was coordinated by ABC Woodlands and the Collinses) affect Schreppler's claims.  Attempts to shore up one's own title do not effect an ouster of an adverse possessor, nor do such actions suffice to toll the running of the statute of limitations.  "An action that merely

---

[170]    *Id.*

[171]    *Id.*

[172]    *See supra* note 14.

[173]    *Acierno v. Goldstein*, 2004 WL 1488673, at *6 n.41 (Del. Ch. June 29, 2004) (emphasis added).

36

alerts the adverse possessor of a superior title, and does not attempt to oust him, has been found insufficient to toll an adverse possession statute."[174]  Instead, the first action taken by the Tumultys that affected Schreppler's claims was the filing of this lawsuit on November 3, 2010.

### 2. When did Schreppler begin asserting possession?

Schreppler recorded his quitclaim deed on November 5, 1990.[175]  He began paying the taxes on the Property two days later.[176]  If the November 5 recording date began the running of the twenty-year period, Schreppler would lose by two days.  The evidence, however, shows that Schreppler's claims began sometime earlier than that, even if an exact date cannot be pinpointed.  The critical question, however, is whether it began more than twenty years before November 3, 2010.

"The payment of taxes may be a weighty fact in support of adverse possession, especially when combined with other overt acts of ownership such as securing a mortgage on the property and the recordation of a deed."[177]  But, there is no suggestion in Delaware case law that either the recording of a deed or the payment of taxes is *necessary* to make out a successful adverse possession claim.  The facts of this case show years of usage by Schreppler before the November 5, 1990 recording of the Wilgus Deed.  As

---

[174]    *Id.*

[175]    JX 17.

[176]    JX 61.

[177]    *Walker*, 2007 WL 2473278, at *4.

detailed in Section I.A.2.a *supra*, Schreppler discovered the Property in the summer of 1985 and established his first continuous campsite in 1986. That campsite, however, was on the Adjacent Parcel. In 1988, he established his second campsite and that was on the Property.

I conclude that the establishment of the second campsite triggered the running of the twenty-year period for Schreppler's adverse possession claims. Because 1988 is more than twenty years before 2010, I need not reach the more difficult question of whether Schreppler's activities in the years of 1986 and 1987 would have sufficed. Instead, I note that I found credible Schreppler's testimony that he visited the property about fifty times annually during the 1986 to 1992 period. Depending on when in 1988 he established the second campsite, Schreppler used the Property between two and almost three years before the recording of the Wilgus Deed. This would amount to between approximately 100 and 140 visits, in addition to the permanent campsite and the other items Schreppler erected on the Property, such as the duck blind and the deer stands. This level of activity, as explained in greater detail in Section III.F *infra*, sufficed to begin the adverse possession period.

### C.    Exclusive

The exclusivity element does not require absolute exclusivity. "Exclusive possession means that the adverse possessor must show exclusive dominion over the land and an appropriation of it to his or her benefit."[178]    Overall, the record shows that

---

[178]    *Id.*

Schreppler used the Property to his own benefit as a normal land owner. He used the land as a weekend getaway and, when he was so inclined, invited others to join him, such as Tim Pulice or Joseph Phillips. He allowed others, such as the Bell Flower Hunting Club to use it, with his permission. Three potential issues are noted: (1) the outfall pipe; (2) the 1997 hunting incident with Steven Short; and (3) Plaintiffs' visits. None of these incidents affect the exclusivity of Schreppler's possession.

The outfall pipe did not affect Schreppler's exclusive usage, largely for the reasons discussed in the preceding Section. Furthermore, the evidence supports a reasonable inference that Schreppler removed the outfall pipe. Although the Adjacent Parcel is not part of this litigation, such an action supports Schreppler's position that he claimed the land exclusively as his own and was willing to fend off a perceived intrusion.

The same can be said of Short's hunting on the Property. Short's testimony indicated that he believed he was on the Collinses' land. In any event, not long after Short hunted on the Property, his deer stand was removed and a "No Trespassing" sign was posted at that location. Short observed those changes and never returned to the Property. These facts also are consistent with exclusive possession. An ordinary landowner may experience trespasses on her land; promptly excluding such individuals upon discovery reinforces a claim of exclusive ownership.

The evidence as to Plaintiffs' visits to the Property or its environs is vague and ambiguous. Ultimately, Plaintiffs failed to prove that any of them have set foot on the Property in a material way since Schreppler first began using it in 1985. At best, Stephen may have ventured twenty yards onto the Property. Such a temporary incursion,

39

assuming it actually happened and keeping in mind that Plaintiffs themselves did not know the boundaries, does not destroy exclusivity.[179]

In *Edwards v. Estate of Muller*,[180] an adverse possession case which found the exclusivity element lacking, the Court discussed various claims to marshland property. Based on the evidence presented in that case, the Court concluded that because "all plaintiffs used the land for hunting or walked over it and that many others have used it or live on it as well . . . the exclusivity element of each plaintiff's adverse possession claim has not been met."[181] Here, by contrast, there is no evidence of regular, or even irregular, use by others.

### D.     Hostile and Adverse

"A hostile claim goes 'against the claim of ownership of all others, including the record owner.'"[182]   "[I]t is not necessary that one entering a property must expressly declare his intention to take and hold the property as his own.  The actual entry upon and the use of the premises as if it were his own, to the exclusion of all others, is sufficient . . . ."[183]  Schreppler satisfies this requirement.

---

[179]     The same is true of any possible incursion by Simpson.  The record leaves similar doubts as to whether he actually set foot on the Property.

[180]     1993 WL 489381 (Del. Ch. Nov. 15, 1993).

[181]     *Id.* at *15.

[182]     *Ayers*, 2006 WL 2052377, at *2 (quoting *Mitchell v. Dorman*, 2004 WL 117580, at *2 (Del. Ch. Jan. 16, 2004)).

[183]     *Lewes Trust Co.*, 170 A.2d at 282.

Schreppler testified that he decided to claim the land as his own as a squatter after discovering from the tax office's records that the property purportedly had no owner. He established two campsites during the 1986 to 1992 period, at least one of which was on the Property. By November of 1990, he had recorded a deed to the Property and was paying taxes on it, both of which are strong indicia of a claim of ownership.[184] Schreppler also responded to each incident of perceived trespass—*i.e.*, Short's hunting and the Collinses' outfall pipe. Plaintiffs' contrary argument, that Schreppler's usage was not hostile, is difficult to understand in light of these facts and the relevant case law. Their main argument appears to be that "recreational" use is not hostile use. I address, and reject, this position in Section III.F.1 *infra*. Otherwise, Plaintiffs' arguments, such as those relating to the lack of "No Trespassing" signs or the 2008 Reassessment, go to the other elements of the adverse possession standard and do not bear on whether Schreppler's use of the Property was hostile.

### E. Open and Notorious

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title possession could be acquired."[185] As this Court held in

---

[184]     *Walker*, 2007 WL 2473278, at *4.

[185]     *Walker*, 2007 WL 2473278, at *4 (footnote omitted).

the seminal case of *Marvel v. Barley Mill Road Homes*,[186] open and notorious possession, like the other adverse possession elements, depends upon the particular land in question:

> No particular act or series of acts is necessary to demonstrate an intention to claim ownership. Such a purpose is sufficiently shown where one goes upon the land and uses it openly and notoriously, as owners of similar lands use their property, to the exclusion of the true owner. *The owner is, of course, chargeable with knowledge of what is openly done on his land and therefore calculated to attract attention.* . . . In determining what will amount to actual possession of land, *considerable importance must be attached to its nature and to the uses to which it can be applied*, or to which the claimant may choose to apply it.[187]

Schreppler made no secret of his use of the Property. The difficulty is that the Property itself is secluded. The Property is a wooded, marshy, landlocked parcel of land that was bounded on the south by a body of water and on the west by a forestry business, adjoined on the north by farmland until the early 2000s, and abutting the Former Tumulty Lands on the east, which were wooded and unoccupied until construction of a housing development from the early to mid-1990s onward. How one openly and notoriously possesses such remote property is, it seems, an unanswered question in Delaware. Similar to the discussion of continuous use, the focus here is on the pre-November 7, 1990 timeframe, before Schreppler recorded the Wilgus deed and began paying taxes.

As just discussed, what constitutes open and notorious use of land depends on the properties and characteristics of the land in question. In challenging Schreppler's claim

---

[186]    104 A.2d 908 (Del. Ch. 1954).

[187]    *Id.* at 911 (emphases added).

42

as to this element, Plaintiffs emphasize variously that: the Property was not enclosed by a fence; Schreppler never timbered the Property; no permanent structures were added; and the boundaries were not posted by no trespassing signs. Some of these uses simply are not feasible. The Property has no access point, except via a limited waterway, which likely would make any construction requiring heavy machinery infeasible and timbering cost-prohibitive.[188] While a fence surely would have shored up Schreppler's claims, fences are not required for a successful adverse possession claim and, as noted, construction on this landlocked parcel would have been difficult.

This leaves Plaintiffs' arguments regarding the lack of "No Trespassing" signs. Such signs place outsiders on notice that land is owned by another and to stay out. Nevertheless, I do not find the dearth of such signs fatal to Schreppler's claims. In this case, the testimony, though seemingly in conflict on this issue, is essentially consistent, at least with respect to the important 1986 to 1990 timeframe. In the late 1980s, Schreppler had posted signage: (1) along the main deer trail from the Former Tumulty Lands;[189] (2)

---

[188]    Schreppler, in fact, did briefly consider timbering the Property after speaking with Simpson, but decided against it. Tr. 606-07. Plaintiffs somewhat surprisingly argue that "What Schreppler fails to acknowledge is that the property could be timbered by way of the navigable waters adjoining it." Pls.' Post-Trial Reply 18. But, there is little, if any, evidence regarding the feasibility of that option. There also is no requirement, however, that one seeking to establish title by adverse possession make maximum economic utilization of the land in question. Rather, the requirement is that the adverse possessor must openly and notoriously possess the land so as to put the owner(s) on notice.

[189]    *Id.* at 608-09.

43

near the pond area;[190] (3) on the western boundary adjoining ABC Woodlands;[191] and (4) around the camps.[192] Although none of Plaintiffs' witnesses saw any of these signs, I find it unlikely that any of them or, indeed, anyone except Schreppler or those invited by him, set foot on the Property before Short in 1997.[193] Given the nature of the land in question, posting a sign on a trail makes sense, because entrants presumably are most likely to venture onto the Property by way of a trail rather than through thick brush, and posting around the pond area was consistent with the waterway providing the only non-trespassory method of accessing the Property.[194]

That said, the evidence regarding the signage still shows that Schreppler made only minimal effort in this regard, and it is unlikely that the signage alone would be sufficient to support the openness and notoriety of Schreppler's claims. In general, Plaintiffs lean too heavily on this argument. An examination of the evidence also reveals the almost total lack of contact that Plaintiffs—and nearly everyone besides Schreppler—

---

[190]  *Id.* at 609.

[191]  *Id.* at 610.

[192]  *Id.* at 611.

[193]  As already noted, Stephen Tumulty and Simpson may have ventured, at best, perhaps twenty yards or so onto the Property.

[194]  Additionally, the evidence supports the proposition that the posting of signage was not common in the area in this time period. *E.g.*, Tr. 220, 234 (Collins, Jr.). On the other hand, Short's testimony, as well as the exhibits cited in Section I.A.2.c, all suggest that it was common to request written permission to hunt on land and that hunters seemingly looked to either common knowledge in the area as to ownership or the deed or tax records to determine the owner.

have had with the Property in the twenty-five years preceding the filing of this lawsuit. The signage in combination with Schreppler's other activities, however, does satisfy the open and notorious standard. That standard requires consideration of the Property's qualities.[195] Evidence of similar use by nearby landowners is therefore instructive in determining what sort of usage is expected of an adverse possessor.[196]

The Collinses testified that, during the years that they farmed the now-Deere Country land, they would visit that property perhaps 12-24 times annually.[197] The Former Tumulty Lands were visited only by trespassers and by Plaintiffs in the limited manner to which they testified. Schreppler testified to making weekly visits to the Property, on average, during the 1988 to 1990 period. Thus, Schreppler's frequency of use of the Property actually exceeded the rate of nearby landowners with respect to their own lands. As to other activities, Schreppler hunted the land, made trails, fished, and camped. Given the nature of the Property as a wild, secluded piece of land, it is difficult to imagine more suitable—and feasible—usages. Thus, I find that Schreppler's usage was open and notorious within the meaning of prior case law.

In *Stellar v. David*,[198] for example, the Superior Court found that the defendants used the marshland in question "for hunting, muskratting, and cutting salt hay" for a

---

[195]    *Marvel*, 104 A.2d at 911.

[196]    *Id.* at 912.

[197]    Tr. 219 (Collins, Jr.).

[198]    257 A.2d 391 (Del. Super. 1969), *rev'd*, 269 A.2d 203 (Del. 1970).

period of three or four months a years.[199]  The court denied the defendants' adverse possession claim, because the defendants had not shown sufficient hostility to overcome a prior landlord-tenant relationship.[200]  The Supreme Court reversed, however, with directions to enter judgment for the defendants on their adverse possession claim.[201]

Similarly, the Court of Chancery once found adverse possession as to a twenty acre tract of undeveloped land on usage similar to this case.  There, the plaintiffs had:

> cut trails . . . for recreational use and maintained those trails; used the tract very frequently—several times a week—for such purposes; given permissions to neighbors to use the tract for camping, hunting or other recreational uses; cut fallen timber on the land for firewood and gave permission to neighbors to do likewise from time to time; posted the land against trespassing on one or two occasions; and ejected others who were on the land without permission.[202]

These two cases are illustrative of a consistent line of decisions recognizing that appropriate usage of the land is determined by reference to the type of land in question.[203]

---

[199]  *Id.* at 393.

[200]  *Id.* at 398.

[201]  269 A.2d at 204.

[202]  *Taraila v. Stevens*, 1989 WL 110545, at *1 (Del. Ch. Sept. 18, 1989).

[203]  *See Dickerson v. Simpson*, 2001 WL 884152, at *1 (Del. Super. July 10, 2001) (noting, in case where a canal and access road had been built, that waterfowl hunting was the "best use" of the land), *aff'd*, 792 A.2d 188, 2002 WL 371866 (Del. 2002); *Doe v. Roe*, 80 A. 352, 355 (Del. Super. 1911) ("The nature or kind of possession from which the law presumes legal title to real estate, depends in a great degree upon the nature and character of the property. Where the property is uninclosed [sic], cutting wood or cultivating the land, and other similar acts are to be regarded as acts proving possession."); *see also Stellar*, 257 A.2d at 395 ("If the chief value of the acreage is trapping muskrats in season, such evidence for the

Schreppler's activities on the land, consisting of hunting, fishing, camping, cutting trails, inviting his friends along, allowing others to use the land with his permission for similar activities, the occasional posting of "No Trespassing" signs, and efforts to exclude trespassers such as Short, all comport with prior case law on open and notorious use of land. Schreppler had engaged in such endeavors on the Property for nearly twenty-five years by the time this action was filed. Based on the peculiar qualities of the Property, Plaintiffs' arguments that the Court should require that Schreppler have done more to establish his claim—such as build a house or timber the land—are unavailing.

## F.      Actual Possession

The requirement of actual possession overlaps to a large extent with open and notorious possession. In this Section, I address two specific issues advanced by Plaintiffs. First, Plaintiffs argue that, as a matter of law, Schreppler's usage cannot support an adverse possession claim. And second, they contend that the undefined boundaries to the Property destroy Schreppler's claims.

Before addressing these questions, I note the following guidance from the *Marvel* opinion that is instructive as to the appropriate inquiry:

> As a general rule it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his exclusive use and enjoyment, and to put the owner on the inquiry as to the nature and extent of the invasion of his rights and this is especially true where the property is so situated as not to admit of permanent

required statutory time may under proper circumstances be sufficient possession to establish ownership adversely.").

47

improvement. In such cases, if the possession comports with the usual management of similar lands by their owners, it will be sufficient. *Neither actual occupation, cultivation, nor residence is necessary where neither the situation of the property nor the use to which it is adapted or applied admits of, or requires, such evidences of ownership.*[204]

### 1. Is Schreppler's usage legally insufficient to support a claim for adverse possession?

Plaintiffs ask this Court to find that recreational use, like Schreppler's activities on the Property, cannot support a claim for adverse possession. For support, Plaintiffs rely chiefly on the Kentucky case of *Moore v. Stills*.[205] Based on that case, it appears to be the law of Kentucky that wild, uncultivated lands cannot be taken by adverse possession while the land remains in a state of nature.[206] The Kentucky Supreme Court, over dissent, specifically held that "the mere recreational use of property has as its aim the enjoyment of the land as it naturally is, and thus by its nature, recreational use will be sporadic and insubstantial. Under our law, such use has never sufficed to establish an adverse possession."[207] Thus, recreational use, in Kentucky, "does not amount to 'actual' possession for adverse possession purposes."[208]

---

[204]     *Marvel*, 104 A.2d at 912 (emphasis added).

[205]     307 A.3d 71 (Ky. 2010).

[206]     *Id.* at 79.

[207]     *Id.*

[208]     *Id.* at 80.

48

The *Moore* case is inapposite here. First, Kentucky applies a clear and convincing evidence standard of proof, which is higher than the standard in Delaware.[209] Second, and more importantly, the *Moore* case conflicts with Delaware law. Foreign cases may provide persuasive guidance, but when they are contrary to the established law of this forum, such cases have no precedential value. As detailed in the preceding Section, Delaware law consistently has recognized that "recreational"[210] usage can support an adverse possession claim. Both *Stellar v. David* and *Taraila v. Stevens* directly stand for that proposition. Other cases recognize it as well.[211]

Plaintiffs attempt to salvage their argument under Delaware law by relying on *Futcher v. Dodd*.[212] That case dealt not with adverse possession, but with the subject

---

[209]     *Id.* at 77-78.

[210]     I use this term with some hesitation, because Plaintiffs appear to contrast it with "productive" or "economic" usage, such as timbering. I disagree with that characterization. The large American arms market, for example, provides evidence of the substantial sums of money that enthusiasts will invest in hunting and shooting. Similarly, the aisles of sporting goods stores are stocked with a bewildering array of fishing equipment, lure, line, and bait. Moreover, there appears to be an active market for camping apart from the tent, sleeping bag, and insect repellant industries. The Delaware state parks, for example, offer a variety of campsite rentals with a range of price points from economical "primitive" camping, to the medium-priced and exotic-sounding "yurt," to the beachfront cottage for the affluent "camper." Accordingly, I use the term "recreational" only as referring to Schreppler's activities, without any intended implication that such endeavors are not worthwhile, productive, or economic.

[211]     *Edwards*, 1993 WL 489381, at *13 & n.18; *Marvel*, 104 A.2d at 911-12.

[212]     1978 WL 22442 (Del. Ch. June 21, 1978).

49

matter jurisdiction of the Court of Chancery.[213]  The court there admittedly made comments in dicta as to the strength of the adverse possession claims—over which it held that it had no jurisdiction—that seemingly align with Plaintiffs' position.  Aside from being dicta, those remarks were not in accordance with Delaware law.[214]  As such, I do not consider *Futcher v. Dodd* to be persuasive.  Instead, consistent with existing precedent, I conclude that recreational use can support an adverse possession claim.

### 2.  The problem of the boundaries of the Property

Finally, there is the matter of the eastern boundary of the Property.  Schreppler determined the boundaries to the Property by reference to the tax map parcel later described in the Wilgus Deed.  Three sides of the Property were bounded by distinct changes in topography: a farm on the north; water on the south; and re-planted forestry land in rows on the west.  Schreppler could not physically locate the eastern boundary until development of Lakewood Estates began in 1992.[215]  The question is whether this is fatal to his claim.  I conclude that it is not.

The issue of boundaries receives scant attention in the adverse possession case law.  Prior precedent confirms only that adversely possessed property must be "of fixed

---

[213]   *Id.* at *1, *3.

[214]   Tellingly, the court's discussion quotes extensively from general treatises, such as *American Jurisprudence, 2d* and *Corpus Juris Secundum*, but includes a "compare" citation to distinguish *Marvel*, which is one of the most cited cases on Delaware adverse possession law and, at least in part, states the requirements differently than the treatises.

[215]   Tr. 588.

and definite boundaries, although it need not be enclosed by fences."[216] Schreppler relied on the tax map to determine the boundaries of the Property. Testimony adduced at trial indicated that such maps are more likely to contain inaccuracies than property surveys.[217] With the Wilgus Deed, Schreppler established record notice of his claim to the tax parcel, but that deed contained no metes and bounds descriptions. In fact, the 1990 Land Tech Survey is the first item in the record that purports to establish an eastern boundary to the Property—*i.e.*, the western boundary of Lakewood Estates—based on metes and bounds.

In prior cases, however, the lack of definitive metes and bounds has not been found to destroy an otherwise valid adverse possession claim.[218] Claims based on tax maps also have succeeded in the past.[219] The definite boundary "requirement" thus

---

[216] *Justice v. McGinn*, 2001 WL 1088760, at *4 (Del. Ch. Aug. 29, 2001). *See also Del. Land & Dev. Co. v. First & Cent. Presbyterian Church of Wilm., Del.*, 147 A. 165, 179 (Del. 1929) (reciting the adverse possession standard as including land "held by fixed and definite boundaries, though not necessarily marked by fences").

[217] Tr. 5 (Johnson: describing tax maps as sometimes accurate); *id.* at 289 (Moore); *id.* at 350 (Simpson). It is somewhat ironic that Plaintiffs emphasize the inaccuracy of tax maps considering that it was a significant survey error that led to this situation.

[218] *See Justice*, 2001 WL 1088760, at *5 (granting adverse possession to part of a claimed parcel depicted roughly by aerial photos followed by a section addressing the question "precisely what land do the [plaintiffs] own by virtue of adverse possession?"); *id.* at *5 n.15 (noting that a survey could be ordered to establish a metes and bounds description); *Dukes v. Williams*, 2000 WL 364190, at *4 (Del. Ch. Mar. 6, 2000) (finding for adverse possessor in *pro se* action with no surveys presented and stating that "the [plaintiffs] and [defendants], absent such a new deed, will be the only persons who know where the boundaries actually lie").

[219] *Dickerson*, 2001 WL 884153, at *1 (finding that the tax map accurately represented the housing lots in question and holding: "I am persuaded by a

51

appears to be a subset of the other elements of an adverse possession claim. That is, the inability to locate a boundary may reflect a failure to satisfy the other requirements of a valid adverse possession claim. As discussed in the preceding Sections of this Opinion, however, Schreppler has satisfied those requirements.

Thus, as demonstrated by the cited cases, a definite boundary line need not be established by a professional survey. Here, there is no evidence that the boundaries of the Property, except the Adjacent Parcel, were ever in dispute with the neighboring landowners, which is the type of situation where precise boundaries would matter most. Indeed, the boundaries of the neighboring properties were seen as the boundaries of the adjoining properties.[220] The lack of definitive metes and bounds or a landmark boundary does not destroy Schreppler's otherwise valid adverse possession claim. The tax map boundaries appear to match the nearby landowners' boundaries fairly accurately.[221] Schreppler construed the boundaries based on the tax map. It is possible that Schreppler originally may have laid claim to more lands than he currently does and Lakewood Estates may have excluded him from some small portion of that land when it began development. To the extent that Lakewood Estates overtook any lands Schreppler may

---

preponderance of the evidence that there has been adverse possession of the lots as shown on the tax map for more than 20 years").

[220] *E.g.*, JX 29 (Lakewood Estates survey showing the boundaries as well of ABC Woodlands, Deere Country, and Schreppler); JX 15 (Schreppler's survey showing same).

[221] *See Dickerson*, 2001 WL 884153, at *1.

have been claiming originally, it effectively terminated his claims as to that piece of land, but did not otherwise affect his claims to the Property.[222]

Overall, I conclude that Schreppler's initial inability to point to the eastern boundary with the specificity of a surveyor does not overtake the fact that he otherwise openly and notoriously adversely possessed the Property for the required statutory period.

## IV. PLAINTIFFS' OTHER CLAIMS

Four of the Counts in the Complaint are at issue in this Opinion: (I) interference with control, use, and quiet enjoyment of property; (II) slander of title; (III) a declaratory judgment as to Plaintiffs' ownership of the Property; and (V) removal of a cloud on Plaintiffs' title.[223] Counts I, III, and V are mooted or otherwise resolved by the fact that Schreppler has prevailed on his adverse possession claim. Similarly, it would seem that a successful adverse possession claim would moot a slander of title claim as well, but the law on this issue is not well developed.

Even if Schreppler's success on his adverse possession counterclaim did not moot Plaintiffs' slander of title claim, that claim still would be legally insufficient. "The elements of a slander of title claim are: '(1) the malicious (2) publication of (3) false

---

[222] *Walker*, 2007 WL 2473278, at *4; *Acierno*, 2004 WL 1488673, at *6 n.41; *see also supra* Section III.B.1 (describing requirements to oust an adverse possessor or toll the running of the statute of limitations).

[223] Count IV requested injunctive relief. That request effectively was resolved by an earlier stipulation of the parties and is now moot as well.

53

matter concerning the state of title of property which (4) causes special damages.'"[224] This claim fails on at least the malice element.[225] Plaintiffs cite to a Rhode Island case suggesting that "malice" in the slander of title context equates to an intent to deceive or injure.[226] Even if that standard governs in Delaware, Plaintiffs have not met it.

Plaintiffs argue that Schreppler's malice is evident from the filing of the Wilgus deed because he knew at the time that Susan Wilgus had no interest in the property. I disagree with this interpretation. Schreppler had the Wilgus Deed recorded after discovering that the Property was listed as "owner unknown" on the county tax maps. Plaintiffs have not shown how the filing of a deed to seemingly unowned property indicates intent to injure or deceive anyone. Indeed, real estate professionals, as evidenced by Johnson's testimony, likely would recognize that Schreppler had filed a

---

[224] *Rudnitsky v. Rudnitsky*, 2000 WL 1724234, at *12 (Del. Ch. Nov. 14, 2000) (quoting *In re Application of Motivational Ctr. Inc.*, 1987 WL 14626, at *2 (Del. Ch. Nov. 3, 1987)). I note that slander of title is an unusual cause of action with a shallow pool of supporting authorities in Delaware. A Westlaw search reveals only eight cases even using the term "slander of title." Of those eight, only three address the issue and the analysis in each is quite minimal.

[225] It also is questionable whether Plaintiffs have shown special damages. *Deutsche Bank Nat'l Trust Co. v. Goldfeder*, 2014 WL 7692441, at *4 (Del. Super. Dec. 9, 2014) ("[I]t is the case virtually everywhere that in order to recover damages for an injurious falsehood regarding title to land, the claimant must be able to show 'special damages' in the form of pecuniary loss and not general damages.").

[226] *Arnold Road Realty Assocs., LLC v. Tiogue Fire Dist.*, 873 A.2d 119, 126 (R.I. 2005).

straw deed and was attempting to create a chain of title where none appeared to exist.[227] The slander of title claim, therefore, if not mooted by my holding regarding Schreppler's adverse possession counterclaim, will be dismissed because Plaintiffs have not proven malice by Schreppler.

## V. CONCLUSION

For the foregoing reasons, I hold that Schreppler has established title to the Property, as shown in the 2008 Tumulty Survey,[228] by adverse possession. In addition, all of Plaintiffs' claims are dismissed with prejudice. Schreppler's slander of title claim also is dismissed with prejudice. Counsel for Schreppler shall submit, on notice, an implementing final judgment and order within ten days of the date of this Opinion.

---

[227] Plaintiffs also fault Schreppler for not undertaking a title search. This argument does not further their position. At trial, the Court heard lengthy and competing testimony by the parties' experts as to how title to the Property should be traced back in time. Given the complexity of that testimony, I find it implausible that a person who is not expert in title research, such as Schreppler, would have discovered the error in the 1990 Land Tech Survey and properly reconstructed the Property's chain of title.

[228] At this time, I adjudicate only Schreppler's adverse possession claim as against the property owners seeking to eject him: the Tumultys. *See supra* note 14. The 2008 Tumulty Survey represents the lands to which Plaintiffs claim title. Accordingly, the metes and bounds of that survey establish the boundaries of the land to which Schreppler has proven title by adverse possession.

NOTE: This diagram is neither to scale, nor does it accurately reflect shapes, angles, or boundaries. It is provided merely as an approximate depiction so that the reader may better understand the general geography.



County Road 412

Deere Country [Collins Acres, LLC] (Previously farmland)

ABC Woodlands

The Property

Lakewood Estates (Former Tumulty Lands)

Martin Mill Pond

N

W ← → E

S

South side of pond (Schreppler's adverse possession claims to this land were dismissed by stipulation in the *ABC Woodlands* case)

Legend

⬇ = Outfall Pipe   △ = Campsite

▧ = Adjacent Parcel