# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SWANN KEYS CIVIC ASSOCIATION, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0614-SG |
| | ) | |
| MICHAEL DIPPOLITO, JOSEPH W. | ) | |
| MANNING, SHARON MANNING, | ) | |
| THERESA A. CORRICK, ROBERT C. | ) | |
| DUFFY III, and JESSICA L. DUFFY, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 9, 2022
Date Decided: December 30, 2022

David C. Hutt and Michelle G. Bounds, of MORRIS JAMES LLP, Georgetown, Delaware, *Attorneys for Petitioner*.

Dean Campbell, of LAW OFFICE OF DEAN A. CAMPBELL, PA, Milton, Delaware, *Attorney for Respondents*.

**GLASSCOCK, Vice Chancellor**

This action represents the unfortunate sequel to litigation apparently resolved in this Court more than thirty-five years ago.[1] In that earlier case, Vice Chancellor Hartnett accepted a settlement to confirm title (the "Settlement")[2] to common areas in a waterfront trailer park on Dirickson Creek in south-eastern Sussex, known as "Swann Keys." The individual lots in Swann Keys were held by the owners in fee. The title to the common areas was confirmed in the litigation in favor of the homeowners' association, the Swann Keys Civic Association (the "Association"), an entity created in light of that suit. Included in the common areas in the Settlement, which were to be vested in the Association, were "two concrete boat ramps." However, when title documents were filed after the settlement, they did not include the boat ramps, which, per the Respondent lot owners, actually occupy portions of the adjoining lots.

In recent years, the behavior of those using the ramps has become noxious. The Respondents here, lot owners adjacent to the ramps, discovered (to their surprise) that they had a claim to title over the ramps. Upset by the boorish behavior of ramp-users and concerned that they might be liable for injuries arising on the ramps, the Respondents physically blocked access to the ramps. The Petitioner Association sued to enjoin the barriers, and to quiet title or establish a prescriptive

---

[1] *See Atkinson v. B.E.T., Inc.*, 1984 WL 159375 (Del. Ch. Dec. 4, 1984).

[2] Other issues, not pertinent here, were resolved by the settlement, which was incorporated by Order of this Court.

1

easement in favor of the Association over the ramps. The matter was tried; this is my post-trial opinion.

After the trial, the Association moved to amend the pleadings to reflect the evidence that supports title to the ramps in favor of the Association under the doctrine of adverse possession, in addition to prescriptive easement. Because I find open, notorious and exclusive use of the ramps by the Association and its members for the prescriptive period, and finding no assertion of ownership or control by the Respondents or their predecessors during that period, I quiet title to the property under both ramps in the Association, as common-use areas. I also dismiss the counterclaims raised by the Respondents, with the exception of their allegations that the Association is maintaining a nuisance, on which issue I reserve decision.

My reasoning is explained, below.

## I. BACKGROUND[3]

*A. The Parties*

The Association is the homeowner's association for Swann Keys (the "Community").[4] The Association manages the Community's common areas,

---

[3] Where the facts are drawn from jointly submitted exhibits, they are referred to according to the numbers provided by the parties and cited as "JTX- __". Oddities in JTX numbers are artifacts of the mode in which the exhibits were submitted.

[4] Because the prescriptive period is satisfied by the period post-dating the Association's creation, and because the record, at times, does not clearly define who was acting on behalf of Swann Keys

amenities, and utilities. A 1985 court order (the "Order"),[5] which followed a class action lawsuit[6] (the "*Atkinson* litigation") and a proposed settlement,[7] explicitly created it to perform this function.[8]

Respondent Michael Dippolito is the record owner of Swann Keys Lot 1, Block B, which is located at the intersection of Blue Teal Road and Swann Drive.[9] He received ownership of the property in April 2019.[10]

Respondents Joseph W. Manning, Sharron Manning, and Theresa A. Corrick (collectively the "Mannings") are the record owners of Swann Keys Lot 1, Block G, which is located at the intersection of Blue Bill Road and Swann Drive.[11]

Respondents Robert C. Duffy III and Jessica L. Duffy (the "Duffys") are the record owners of Swann Keys Lot 2, Block F, which is the second lot on Laws Point Road.[12]

---

and its communal amenities prior to 1985, "Community" is, in context, also used to designate those managing Swann Keys.

[5] JTX-551–64.

[6] *See Atkinson*, 1984 WL 159375.

[7] JTX-565–80.

[8] *See Atkinson*, 1984 WL 159375, at *5.

[9] JTX-411–12.

[10] *Id.*

[11] *See* JTX-425–27 (showing William and Mary Manning's ownership). The Mannings inherited the property from their father, William Manning.

[12] JTX-440–42.

3

*B. Setting the Scene*

Swann Keys is a waterfront trailer park in Sussex County. The development sits on a series of lagoons that open onto Dirickson Creek, which itself opens onto Little Assawoman Bay. Within the Community there are two boat ramps—the West Ramp and the East Ramp—which are the subject of this action.[13] The West Ramp is located on Swann Drive between Blue Bill Drive and Laws Point Road.[14] The East Ramp is located on Swann Drive one lot east of the intersection of Blue Teal Road and Swann Drive.[15] The Mannings' and Duffys' deeds refer to the Swann Keys plot plan, which indicates that they each own a portion of the West Ramp as a part of their lots.[16] Dippolito's deed—likewise via the plot plan—indicates that he owns a portion of East Ramp.[17] Several non-parties, the Shaffers and the Matterns, issued Corrective and Confirmatory Deeds such that the Association is record owner of the remaining portions of the ramps.[18]

---

[13] *See* Verified Pet. Quiet Title & Other Relief, Dkt. No. 1.
[14] JTX-1.
[15] JTX-2.
[16] *See* JTX-425–27; *see also* JTX-440–42.
[17] *See* JTX-411–12.
[18] *See* Resp'ts' Omnibus Answer to Pet'r's Verified Pet. Quiet Title & Other Relief and Defs.' Countercl. Injunctive Relief ¶ 31, Dkt. No. 21.

*C. Swann Keys Through the Ages*

In 1965 James and Gladys Swann (the "Swanns") purchased the land that would become Swann Keys.[19] They sold a number of lots prior to formally plotting the development in 1969 and 1970.[20] The plot plan does not show the ramps; the lots adjacent to the ramps are shown as contiguous to one another.[21] Later, between 1970 and 1971, the Swanns sold their interest to Exten Associates, Inc. ("Exten").[22] Exten managed the Community and sold lots until it declared bankruptcy in 1974.[23] Swann Keys sold at a Sheriff's sale to B.E.T., Inc. ("B.E.T.") in 1975.[24] That entity took over management of Swann Keys and sold additional lots.[25] However, when B.E.T. attempted to raise their fees in 1980, the Swann Keys residents brought a class action, the *Atkinson* litigation, in this Court to enforce a restrictive covenant, which required a non-profit to collect assessments and operate the common areas.[26]

Then-Vice Chancellor Hartnett, faced with what he described as "almost insurmountable title problems,"[27] tasked the parties with determining "how the nonprofit corporation [was] to obtain title to the common facilities and the amount

---

[19] *Atkinson*, 1984 WL 159375, at *1.
[20] *Id.*
[21] JTX-392–97.
[22] *Atkinson*, 1984 WL 159375, at *1.
[23] *Id.* at *2.
[24] *Id.*
[25] *Id.*
[26] *Id.* at *1–2.
[27] *Id.* at *1.

5

of any sum to be paid to [B.E.T.] as reimbursement for some or all of the costs of the common facilities it constructed."[28] The parties set to work and ultimately came to an accord; a proposed settlement followed.[29] That settlement proposed the exchange of $300,000 for, among other things, "the basketball court, playground equipment, pool, clubhouse, tennis courts, *two concrete boat ramps*, entrance gatehouse and mobile home office, equipment and furniture."[30] Notice of this proposed settlement, including the intention to purchase "two concrete boat ramps" from B.E.T.,[31] was mailed to the residents of Swann Keys.[32] Then-Vice Chancellor Hartnett approved the Settlement,[33] and incorporated its contents within his final order.[34] The Court retained jurisdiction

> for the purpose of enforcing, protecting and implementing the terms of this Order, and the terms of the Compromise and Settlement Agreement . . . including the resolution of any dispute that may arise with respect to effectuation of any of the provisions . . . and for the entry of such further orders as may be necessary or appropriate.[35]

---

[28] *Id.* at *5.
[29] JTX-565–80.
[30] JTX-566 (emphasis added).
[31] JTX-462. The Respondents point out that the land under the ramps had already been deeded out to the adjacent lot owners. Defs. Post-Trial Opening Br. 3–6, Dkt. No. 42.
[32] JTX-457–533.
[33] JTX-551. For the Settlement, see JTX-565–80 (Compromise and Settlement Agreement).
[34] JTX-552–64. For the deeds conveying title to the Association, see JTX-398–99 and JTX-400–01.
[35] JTX-564.

Use of the boat ramps by members of the Swann Keys community dates back to at least 1969.[36] From the beginning, the Community attempted to limit use of the ramps to Community residents, with mixed success: in these early days the Community issued boat registration stickers and maintained locks and chains to limit ramp access to those resident in the park.[37] The developer, prior to the Association's formation, and later the Association, would occasionally change these lock codes and distribute the new codes to Community members from the Swann Keys office.[38] Presently, if a code is requested by email, the office confirms that the requestor is a resident and, only then, replies with the code.[39]

Beyond the use of locks and chains, the Association has tried to limit the non-resident use of the boat ramps. Via newsletter, the Association told Swann Keys residents that the boat ramps are for their use and that residents should avoid sharing the lock codes.[40] In 2020,[41] the Association mailed letters to contractors who launch, retrieve, and store boats in the local area, requesting that these businesses only use the boat ramps for boats owned by Swann Keys residents.[42]

---

[36] Tr. 2.3.22 Trial 91:13–92:15, Dkt. No. 40 [hereinafter Trial Tr.].
[37] *Id.* 96:9–22.
[38] *Id.* 96:20–97:7, 98:18–99:13.
[39] *Id.* 104:5–12.
[40] *Id.* 104:23–105:9.
[41] *Id.* 107:18–108:8.
[42] *Id.* 104:23–14.

Beyond controlling ingress and egress, the Association has maintained and improved the ramps. Specifically, the Association repaired and improved the East Ramp in 1988,[43] and has receipts for repairs made to the East Ramp in 2005, 2012, and 2014.[44] In 2005, after receiving no objection from Mr. Dippolito's predecessor in interest,[45] the Association made $5,000 of repairs.[46] In 2012, the Association paid $3,000 to repair a wash hole in the canal bed at the end of the ramp.[47] In 2014, the Association paid $10,400 to extend the East Ramp and repair a wash-hole at its former base.[48] More regular upkeep has taken the form of maintenance of the walkways, chains, and locks.[49]

### D. The Unpleasantness

In recent years, some ramp users have behaved boorishly. Those living adjacent to the ramps have suffered accordingly. The evidence at trial showed that, on occasion, boaters have trespassed, loitered, and damaged property, including

---

[43] *Id.* 95:2–16; JTX 10.
[44] JTX-253; JTX-42; JTX-48; JTX-51.
[45] JTX-244 ("Swann Keys will be putting in a new boat ramp with permanent breakwater in the canal next to your property. We need you to sign off that you have no objection to this work being done.").
[46] JTX-253.
[47] Trial Tr. 64:6:16; JTX-42.
[48] JTX-46; JTX-48, JTX-51.
[49] Trial Tr. 95:17–96:8, 109:2–11 (noting that when materials were needed for these smaller repairs a debit card was used).

moored boats.[50]  They have left the guard chains unlatched.[51]  They have strewn cigarette butts and litter.[52]  They have held picnics and left trash on the neighbors' lawns.[53]  They have left dog excrement, and have themselves micturated at the ramp.[54]  They have, irrespective of the hour, been noisy.[55]  They have verbally abused the neighbors.[56] They have behaved, in other words, as members of the genus and species described by taxonomist Franc White as *Swinus Americanus*.[57]

*E. Closure of Ramps*

After a number of informal complaints to members of the board, the maintenance man, and other members of the community, as well as a formal complaint in June 2020,[58] the Respondents blocked the East Ramp in October 2020 with a concrete "jersey" barrier.[59]  The closure of the East Ramp diverted all boat loading and unloading to the West Ramp.[60]  In response, the Petitioner filed this

---

[50] *Id.* 137:11–138:10, 206:12-21, 141:13–142:12, 153:18–154:9, 191:22–192:4.
[51] *Id.* 161:8–162:18.
[52] *Id.* 166:16–167:3.
[53] *Id.* 180:3–18.
[54] *Id.* 193:14–20.
[55] *Id.* 140:2–141:9, 155:21–157:1, 182:14–24, 190:12–19.
[56] *Id.* 199:3–202:19.
[57] *See gen.* Franc White, http://francwhite.com/ (last visited Dec. 27, 2022).
[58] Trial Tr. 192:5–20.
[59] *Id.* 215:10–17, 242:4–13; JTX-1.
[60] Trial Tr. 215:10–17.

lawsuit,[61] and the Respondents subsequently shut down West Ramp.[62] These are the only boat ramps in the community.[63]

### F. Procedural History

Petitioner filed its Verified Petition to Quiet Title & for Other Relief (the "Petition") July 15, 2021.[64] The Petition included four counts for relief, which sought to quiet title to the boat ramps, an injunction to remove the "jersey" barrier and prevent any further blockage from either of the ramps, an easement by estoppel over the boat ramps, and a prescriptive easement over the boat ramps.[65] A request for a temporary restraining order to allow the Association to reopen the boat ramps followed on August 13, 2021.[66] I granted that relief subject to a $10,000 bond on August 17, 2021.[67] On October 6, 2021, Respondents entered their Answer and Counterclaims, which contained three counts for relief.[68] Discovery followed, and I

---

[61] *See* Verified Pet. Quiet Title & Other Relief ¶¶ 25–32.

[62] *See* Trial Tr. 215:18–22.

[63] Because Dirickson Creek connects to navigable water, the lagoons in Swann Keys can be reached by boat without the use of the ramps in question. It would be a significant inconvenience to do so. There is a public ramp on the north side of Little Assawoman Bay, in the Assawoman Wildlife Area, but that ramp is a long drive from Swann Keys, some of it on unimproved dirt roads. Another ramp is easier to reach by car and boat trailer, but a significant distance from Swann Keys by water; the state ramp on The Ditch connecting Little and Great Assawoman Bays, adjacent to the Delaware/Maryland state line.

[64] *See* Verified Pet. Quiet Title & Other Relief.

[65] *Id.* ¶¶ 33–48.

[66] *See* Pet'r's Mot. Expedited Proceedings and Temporary Restraining Order, Dkt. No. 8.

[67] Judicial Action Form, Dkt. No. 13; Tr. 8.17.21 Rulings Ct. Pet'r's Mot. TRO, Dkt. No. 17.

[68] *See* Resp'ts' Omnibus Answer to Pet'r's Verified Pet. Quiet Title & Other Relief and Defs.' Countercl. Injunctive Relief.

held a one-day trial on February 3, 2022.[69]  Post-trial briefing was complete on March 28, 2022,[70] but on April 4, 2022 Petitioner sought leave to amend their petition to add a claim for adverse possession.[71]  On May 6, 2022, subject to Petitioner paying the cost of the additional briefing required, I granted the requested leave to amend.[72]  In granting the Petitioner's leave to amend I stated that if the Respondents could demonstrate prejudice such that they were "precluded from developing evidence in discovery and presenting it at trial that might be material to the outcome," I would deny the relief sought.[73]  Supplemental briefing followed and was complete on June 15, 2022.[74]  Respondents sought to supplement the trial record, and I granted this request on August 18, 2022.[75]  The matter was fully submitted on September 9, 2022.[76]

---

[69] *See* Trial Tr.
[70] *See* Pet'r Swann Keys Civic Association's Post-Trial Answering Br., Dkt. No., 45.
[71] *See* Mot. Leave Amend Pet'r Swann Keys Civic Association's Verified Pet. Quiet Title Pursuant to Chancery Rule 15(B), Dkt. No. 48.
[72] Judicial Action Form, Dkt. No. 51.
[73] Tr. 5-6-22 Telephonic Hr'g Regarding Pet'r's Mot. Leave Amend 6:9–7:14, Dkt. No. 55.
[74] *See* Pet'r's Suppl. Br. Pet'r's Claim Adverse Possession, Dkt. No. 58.
[75] Granted (Stipulation Regarding Def's Request Suppl. Tr. R.), Dkt. No. 67.
[76] Joint Letter for Vice Chancellor Glasscock from David Hutt and Dean Campbell, Dkt. No. 69.

## II. ANALYSIS

### A. Leave to Amend

I granted the Petitioner's leave to amend on May 6, 2022, subject to supplemental briefing; I address the issue here in light of that briefing.[77] Simply stated, the Petition originally sought to quiet title to the property occupied by the boat ramps in the Association, and alternatively sought a finding of easement by prescription. The quiet title request logically—if not explicitly—encompassed title by adverse possession. The evidence at trial supported adverse possession. If a party opposing leave to amend can show that it was prejudiced by an inability to seek discovery on the amended claim and to present such evidence at trial, I should deny the amendment; otherwise, leave to amend is granted freely.[78]

Respondents have proved unable to make a showing of prejudice. In their supplemental brief, Respondents' arguments focus on the difference between "use" (for purposes of easement) and "possession" (for purposes of adverse possession).[79] Rather than explaining how they were prejudiced and describing the evidence they were unable to gather and present, the Respondents primarily argue the merits.

---

[77] Judicial Action Form, Dkt. No. 51.

[78] *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 761 (Del. Ch. 2014) (internal quotations omitted) ("The primary test for prejudice when a party seeks to assert a new theory is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory."); *see also* Tr. 5-6-22 Telephonic Hr'g Regarding Pet'r's Mot. Leave Amend 6:9–7:14.

[79] Defs.' Suppl. Br. Concerning Pl.'s Mot. Amend Pleadings 5, Dkt. No. 56.

However, the Respondents do aver that "had [they] been put on notice that possession, instead of use, was an issue, [they] would likely have provided additional testimony, and possibly documentation, of the possession of the boat ramps over the years."[80] This statement is entirely conclusory. It fails to explain what evidence would have been gathered, why it would have helped the Respondents, and how they were prejudiced. If such evidence existed, it would have been pertinent to prescriptive easement as well as adverse possession. As it is, the Respondents did not depose any witnesses in developing their case. I also note that the adverse possession claim is broader than for prescriptive easement; it requires a showing, as Respondents themselves point out, of use and possession,[81] and not simply use. In these circumstances, not only have Respondents failed to show prejudice, but it is difficult to understand a theory of how prejudice could have occurred.

As there has been no showing of prejudice, leave to amend to conform to the evidence is granted, and the adverse possession claim stands to be judged on the merits.

I next turn to that analysis. I note that among the issues litigated here was whether the Settlement and Order in the *Atkinson* litigation created legal title to the land under the ramps in the Association. This assertion by the Petitioner was

---

[80] *Id.* 10.
[81] *Id.* (citing RICHARD R. POWELL, POWELL ON REAL PROPERTY §§ 91.02–91.03 (2013)).

vigorously opposed by Respondents. The Order, by incorporation of the Settlement, directs the "two concrete boat ramps"—which I find by a preponderance of the evidence refers to the East and West Ramps at issue here—to be transferred to the Association.[82] The deeds implementing the Order fail to mention the ramps, however.[83] Issues regarding the effect of the Order on title are legion.[84] If ownership is not provided to the ramps by the Settlement and Order, however, title to the ramps by prescription is manifest from the trial record. For purposes of this Memorandum Opinion, therefore, I assume, without deciding, that the Respondents hold record title to land underlying the boat ramps, and consider only whether the Petitioner has nonetheless established title by prescriptive use.

*B. Adverse Possession*

To quiet title by adverse possession a plaintiff must show by a preponderance of the evidence that she used and possessed the property at issue, in a manner open and notorious, exclusive, and hostile and adverse, for a continuous statutorily-

---

[82] JTX-554; JTX-566.

[83] JTX-398–99; JTX-400–01.

[84] These include, in part, whether the developer owned the ramps as of the date of the Order; whether the Respondents' predecessors had adequate notice that any property interest in the ramps was jeopardized by failing to object; whether the omission of the ramps from the deed was an intentional waiver of rights under the Order, etc.

prescribed period of years.[85] The prescriptive period in Delaware is twenty years.[86] The evidence shows that Petitioner has satisfied each of these elements.

I address each element below. I note, however, that there could hardly be a clearer case for adverse possession. The ramps are paved and obvious features of the community. They connect the roads of Swann Keys to the lagoons, where the Association's members dock their boats.[87] At the time of the litigation, some 200 boats were docked in the lagoons, accessed by the ramps.[88] The Respondents did not believe, until shortly before the litigation, that they had any claim of title to the land occupied by the ramps.[89] Even under the Respondents' theory, no individual lot owner owned an entire ramp; that is, it is clear the neither ramp was an amenity for a particular lot. The Association, going back long before the prescriptive period required, has maintained the ramps for the use of its members, has attempted to exclude trespassers by closing off the ramps through the use of locks and chains, and has never sought permission for use from the Respondents,[90] nor acknowledged a

---

[85] *Tumulty v. Schreppler*, 132 A.3d 4, 23–24 (Del. Ch. 2015) (quoting *Taraila v. Stevens*, 1989 WL 110545, at *1 (Del. Ch. Sept. 18, 1989). It is an anomaly of our law that adverse possession requires only a preponderance of evidence, while easement by prescription requires clear and convincing evidence, *see Ayers v. Pave It, LLC*, 2006 WL 2052377, at *2 (Del. Ch. July 11, 2006); in any event, the evidence of adverse possession here, I find, would clear either bar.

[86] 10 *Del. C.* § 7901.

[87] Trial Tr. 49:6–50:17.

[88] *Id.*

[89] *Id.* 192:21–193:6, 214:15–215:9, 229:15–18, 233:10–14, 241:1–10.

[90] As required by Department of Natural Resources and Environmental Control, the Association did obtain permission for repairs to a ramp from Respondents, as *adjacent* property owners to the ramps themselves.

claim of others over the property. The Respondents, by contrast, evinced no claim to the property under the ramps until this dispute arose long after the prescriptive period had run. They and their predecessors, the record demonstrates, have never attempted to make use of the ramps, outside their right to do so as Community residents for launching boats. The disputed title results from what the *Atkinson* court described as near-insurmountable title problems, and the failure of the *Atkinson* litigation, in 1985, to resolve title to the ramps. It is to quiet title in such situations that the doctrine of adverse possession was created. I examine the facts in light of the elements of adverse possession, below. I find that the preponderance of the evidence satisfies each.

### 1. Open and Notorious Use

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title possession could be acquired."[91] The question is whether the owner and the public would notice that the alleged possessor is in possession of the land.

---

[91] *Tumulty*, 132 A.3d at 27 (quoting *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Super. Ct. Aug. 31, 2007) (internal quotations omitted).

There is no question that the Association unfurled its flag.[92] These ramps are paved and obvious features. Since at least the late 1960's or early 1970's, the Association and its precursor developers maintained chains and locks limiting access to the ramps.[93] Recently, they announced to residents rules and restrictions for use of the ramps.[94] Residents of the neighborhood understood that the ramps were maintained by the Association. In fact, the Duffys believed that the boat ramp was on communal property until 2019 or 2020.[95] Similarly, Dipollito did not believe the boat ramps were his property until he attempted to purchase insurance.[96]

## 2. Hostile and Adverse Use

"A hostile claim goes against the claim of ownership of all others, including the record owner."[97] This element simply requires the adverse possessor to use the

---

[92] *See Marvel v. Barley Mill Rd. Homes*, 104 A.2d 908, 911 (Del. Ch. 1954).

[93] Trial. Tr. 96:9–22.

[94] *See* JTX-34–35.

[95] Trial Tr. 192:21–193:6, 214:15–215:9, 229:15–18.

[96] *Id.* 233:10–12. "I didn't know who it belonged to. I didn't believe it was mine, though. I didn't believe it was on my property, I should say." *Id.* 241:8–10. Insomuch as the Respondents rely on a "neighborly accommodation" defense to adverse possession, this evidence is largely fatal to such a defense. To the extent this jurisdiction respects the doctrine of neighborly accommodation, the doctrine simply means that a failure to object to the use of one's property is, under the circumstances, explicable as an accommodation rather than an acknowledgment of superior right; it is better stated as a kind of permissive use or license demonstrated by circumstances. The record does not support the theory that the Respondents (none of whom testified that they were aware of any claim of record title in themselves) extended a license to Swann Keys homeowners to use their property.

[97] *Tumulty*, 132 A.3d at 27 (quoting *Ayers v. Pave It, LLC*, 2006 WL 2052377, at *2 (Del. Ch. July 11, 2006)) (internal quotations omitted).

17

property "as if it were his own, to the exclusion of all others."[98] Again, the Association and its predecessors attempted to exclude those other than its members from use of the ramps, through the use of stickers, locks, and chains. The Association also told residents not to share passcodes and mailed letters to local contractors who launch and retrieve boats, instructing them to only use the boat ramps for boats owned by Swann Keys residents. The Respondents point out that these efforts were not entirely successful; true, but as described below, not fatal to hostile and adverse use. The use was certainly hostile to any use (other than as homeowners launching boats) by the Respondents; the first assertion of right by the Respondents of this property led promptly to this litigation.

### 3. Exclusivity

The "exclusivity" element of adverse possession requires that the adverse possessor show "exclusive dominion over the land and an appropriation of it to his or her benefit."[99] That is, that the possessor acted as an owner. This, however, does not require "absolute exclusivity."[100] The fact that trespassers sometimes use the property does not necessarily void the exclusivity element.

---

[98] *Id.*
[99] *Id.* at 26.
[100] *Id.*

Respondents cite *Edwards v. Estate of Muller* to the contrary.[101] In *Edwards*, the Court found that the claimants had failed to show exclusivity.[102] There, multiple adverse parties laid claim to a piece of marshland.[103] However, none exercised exclusive possession, because of the use of the other plaintiffs and because non-parties used the land similarly or lived there.[104] That is not the case here. Here, the adverse possessor is an association of individuals rather than individuals in their own right. Each permitted user believed they had use of the land by virtue of their membership in, or by permission of, the Association. As laid out above, the Association and its members attempted to exclude the non-resident public.

The Respondents point to evidence of record that "drip trails" leading out of the park indicate that non-homeowners were likely using the ramp.[105] True, but unavailing. The fact that outsiders managed to trespass over the property does not defeat the claim. "An ordinary landowner may experience trespasses on her land; promptly excluding such individuals upon discovery reinforces a claim of exclusive ownership."[106] Here, the evidence was that individuals on behalf of the Association

---

[101] 1993 WL 489381 (Del. Ch. Oct. 18, 1993).
[102] *Id.* at *14–15.
[103] *Id.* at *13.
[104] *Id.* at *14–15.
[105] Trial Tr. 223:3–223:17.
[106] *Tumulty*, 132 A.3d at 26.

took actions to avoid or limit trespass,[107] and that those actions—such as chains and locks—were obvious to the community, the public, and the Respondents.

### 4. Actual Possession

"The requirement of actual possession overlaps to a large extent with open and notorious possession."[108]

> As a general rule it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his exclusive use and enjoyment, and to put the owner on the inquiry as to the nature and extent of the invasion of his rights and this is especially true where the property is so situated as not to admit of permanent improvement. In such cases, *if the possession comports with the usual management of similar lands by their owners, it will be sufficient.*[109]

Here, the use and maintenance of the boat ramps by the Association and its members amply satisfies possession for the prescriptive period.

### 5. Continuity of Possession

Association members testified to use of the ramps as far back as 1969.[110] Absent tacking, looking only to the use of the ramps after the Association's

---

[107] Trial Tr. 164:19–165:4.

[108] *Tumulty*, 132 A.3d at 30.

[109] *Marvel*, 104 A.2d at 912 (emphasis added).

[110] Trial Tr. 91:13–92:15; *Treherne v. Forsight, LLC*, 2022 WL 2057563, at *7 (Del. Ch. June 6, 2022), report and recommendation adopted, (Del. Ch. 2022) (citation and internal quotation omitted) ("The doctrine of tacking may be invoked where the predecessor in title was under the impression that she was conveying to the plaintiffs the property in dispute, and the plaintiffs were under the impression that by reason of the deed they were obtaining title to that property even if the instrument does not convey legal title to the property.").

formation in 1985, the Association and its members used the ramps for roughly 35 years before this action was filed. The use required is that consonant with the property as developed; here as a seasonal boat ramp used each year for well more than twenty years.

Having found by a preponderance of the evidence that the Petitioner has satisfied each element of adverse possession, I turn to the Respondents' counterclaims.

*C. Trespass and Nuisance Counterclaims*

The Respondents brought three counterclaims; Count I: Quiet Title, Count II: Permanent Injunction to Enjoin Trespass, and Count III: Permanent Injunction to Enjoin Nuisance.[111] The adverse possession analysis above fully disposes of Count I and its requested relief.[112]

Count II seeks a permanent injunction, to enjoin the "Association and its members from entering upon [Respondents'] real property."[113] To the extent this claim involves the land to which I have quieted title in the Petitioner, it is moot. To the extent that the claim seeks injunctive relief to prevent trespass on the

---

[111] Resp'ts' Omnibus Answer to Pet'r's Verified Pet. Quiet Title & Other Relief and Defs.' Countercl. Injunctive Relief, 19–21.

[112] *See id.* 19.

[113] *Id.* 20.

Respondents' own lots, adjacent to the boat ramps, there is certainly evidence that individuals using the ramps have in the past trespassed on the Respondents' property. Trespass to real property is a tort and can be a criminal offense as well. The sole counterclaim defendant is the Association, however, and there is no evidence that that entity has trespassed, or encouraged trespass. Moreover, equity does not generally assume future torts, and there is no ongoing trespass here, just a suspicion that trespasses will happen in the future.[114] If they do, the Respondents have failed to demonstrate why legal remedies are not sufficient; they have thus failed to show *the sine qua non* of injunctive relief.[115] Accordingly, and for all the reasons above, the request for a permanent injunction enjoining trespass is denied.

Count III requests permanent injunctive relief to enjoin "the Association and its members from continuing the nuisance, including but not limited to, enjoining the Association from providing the members with false information that they have a right to trespass onto [Respondents'] real property."[116] I confess that I am not entirely sure what the Counterclaim Plaintiffs seek here. They ask me to forbid dissemination of "false information that [Community residents] have a right to trespass." Aside from the general equitable prohibition on enjoining future

---

[114] *See Int'l Bus. Machines Corp. v. Comdisco, Inc.*, 602 A.2d 74, 79–82 (Del. Ch. 1991); *See also Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 10–11 (Del. Ch. 2019).

[115] *In re COVID-Related Restrictions on Religious Servs.*, 2022 WL 17101449, at *23 (Del. Ch. Nov. 21, 2022).

[116] Resp'ts' Omnibus Answer to Pet'r's Verified Pet. Quiet Title & Other Relief and Defs.' Countercl. Injunctive Relief, 20.

speech,[117] this claim seems to be mooted by my decision to quiet title to the ramps in the Association. Use of the ramps, in other words, does not work a trespass.

There was evidence of noxious behavior by some boaters at the ramps, however, and I examine that evidence, under the assumption that Counterclaim-Plaintiffs are seeking to enjoin maintenance by the Association of a private nuisance at the ramps. Any relief must rest upon a demonstration of the existence of a private nuisance, and I begin there. Delaware recognizes two types of private nuisance, but only nuisance in fact is applicable here.[118] A "claim of nuisance will lie where a defendant, although acting lawfully on his own property, permits acts or conditions 'which become nuisances due to the circumstances or location or manner of operation or performance.'"[119] The plaintiff must show by a preponderance of the evidence that a defendant neighbor's use of its property "constitutes an *unreasonable* invasion of the plaintiff's property rights."[120] "This analysis—whether the conditions permitted to emanate from one property upon another are so unreasonable

---

[117] *See, e.g., Preston Hollow*, 216 A.3d.

[118] *See Beam v. Cloverland Farms Dairy, Inc.*, 2006 WL 2588991, at *2 (Del. Ch. Sept. 6, 2006) ("A nuisance per se involves an interference with the property rights of another that is intentional; or such an interference resulting from abnormally hazardous activity on the defendant's property; or such an interference in violation of a statute intended to protect public safety.").

[119] *Id.* (quoting *Artesian Water Co. v. Government of New Castle Cnty.*, 1983 WL 17986, at *15 (Del. Ch. Aug. 4, 1983)).

[120] *Id.*

23

as to constitute nuisance-in-fact—involves a weighing of the facts and of the conflicting interests of the parties involved."[121]

I will not recite again here the litany of antisocial behavior demonstrated in the record, caused by users of the ramps. For the present, I find sufficient to say that the Respondents have endured unpleasantness from individual users of the adjacent boat ramps. The question is whether under these facts, the unpleasantries are an unreasonable impairment of the Respondents' property rights,[122] and whether a balancing of the parties' interests favors application of an equitable remedy: here, presumably, permanently prohibiting use of the ramps. Although Delaware does not recognize "coming to the nuisance" as a defense,[123] I may take into such balance the fact that Respondents purchased homes next to a boat ramp in a marina community. Proximity to the boat ramps likely featured into the Respondents' calculus of whether to purchase their homes, as well as the price they paid.

The incidents about which the Respondents complain are of recent vintage and episodic. There is nothing inherent in the use of the ramps that constitutes an unreasonable invasion of the Respondents' rights of quiet enjoyment. The availability of the ramps as a community amenity is, and has been from the inception of Swann Keys, a valuable benefit available to homeowners, including the

---

[121] *Id.*
[122] *Id.* at \*3.
[123] *Cain v. Roggero*, 38 A.2d 735, 737 (Del. Ch. 1944).

Respondents. The incidents reported by the Respondents are unsettling but are not necessary to the use of the ramps. The record does not demonstrate that efforts by the Respondents, including reporting trespassers to the police and obnoxious behavior to the Association, will not provide relief to the Respondents.[124] The equitable relief sought[125] as I understand it—enjoining the use of the ramps—is unsupportable in equity on this record.

Nonetheless, the mal-behavior of some boaters, both in trespassing and in noisy and antisocial behavior disturbing to some neighbors, was demonstrated at trial. It is incumbent upon the Association[126] to act to reasonably ensure that the common areas—now including the boat ramps—serve as Community amenities. This includes expending efforts sufficient to maintenance of the quiet enjoyment of the neighboring properties. I need not decide here whether the behavior demonstrated, given its nature and duration, amounts to a nuisance. This is because the parties are in a superior position than am I to determine what rules for and limitations on use of the ramps will ameliorate the Respondents' legitimate concerns. I assume that, with the possible exception of duck hunters, little use will be made of

---

[124] Presumably, those engaging in anti-social behavior are readily identified by auto and trailer license plates.

[125] The Respondents have not sought injunctive relief of a more limited nature, such as restrictions on the time or manner of use of the ramp, beyond asking that I enjoin "false information" by the Association; as I stated above, that claim for relief is moot.

[126] I note that, in the one instance Respondents informed the Association of an issue, the Association resolved the matter. Trial Tr. 36:22–39:20, 150:5–24, 157:14–158:4, 175:20–176:5, 243:12–17.

the ramps for the next few months. The parties have time, in light of my decision concerning ownership here, to confer and reconcile their differences. Accordingly, I reserve on whether the Respondents have established that the current use of the ramps constitutes a nuisance, and, if so, what equitable relief such a finding invokes. I direct the parties to submit a joint letter, no later than March 1, 2023, informing me that the matter has been resolved and whether an order implementing the resolution is required, or submitting the remaining questions addressed above for decision. In the latter case, I will decide the remaining matters without further evidence or argument.

## III. CONCLUSION

For the reasons above, title to the land under the boat ramps is quieted in the Association. The counterclaims are DENIED, with the exception that I reserve on the claim of nuisance, as described above. The Association shall at its own expense, but with review by the Respondents, prepare documents of title consistent with this Opinion. The Association shall also pay to Respondents the reasonable fees and cost in connection with its Motion to Amend and the briefing thereon. The parties should submit a form of order consistent with this Memorandum Opinion.

26